# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

DAVID PHILLIPS, ROBIN L.     )
BROWNING as the EXECUTOR   )
of the ESTATE OF DIANE       )
BROWNING, MARY E.           )
CARRARA, and WENDY CALMA, )
individually and on behalf of a    )
class of persons,             )
                          )     Case No. 2:16-cv-00837-JEO
     Plaintiffs,        )
                          )
v.                         )
                          )
HOBBY LOBBY STORES, INC.,   )
                          )
     Defendant.       )

## <u>MEMORANDUM OPINION</u>

This is a putative class action brought by the Estate of Diane Browning[1] and Mary Carrara (collectively, "Plaintiffs") against retailer Hobby Lobby Stores, Inc.[2] The case concerns the manner in which Hobby Lobby administers a weekly coupon offering "40% Off One Item at Regular Price." Diane Browning, an Alabama resident, used a 40% off coupon when she purchased a small chest of drawers that was priced "Always 30% Off" the "marked price." Mary Carrara, an Illinois resident, used a 40% off coupon on multiple occasions when she purchased

---

[1] Diane Browning died after filing this lawsuit. Mrs. Browning's husband, Robin Browning, was appointed executor of her estate. In that capacity, Robin Browning has been substituted as plaintiff. (Docs. 40 & 42).

[2] The claims of plaintiffs David Phillips and Wendy Calma have been dismissed. (Doc. 63).

fabric that was similarly priced "Always 30% Off" the "marked price." On all purchases, Hobby Lobby applied the 40% off coupon to the marked price rather than the 30% off price. In their Fourth Amended Complaint, Plaintiffs allege that this practice constitutes breach of contract and violates the Alabama Deceptive Trade Practices Act ("ADTPA"), Ala. Code § 9-19-1 *et seq.*, and the Illinois Consumer Fraud Act ("ICFA"), 815 Ill. Comp. Stat. 505/1 *et seq.*, and Illinois Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 510/1 *et seq.* ("IDTPA"). (Doc. 49).

The case is now before the court on two motions for summary judgment filed by Hobby Lobby: (1) motion for summary judgment on Mary Carrara's claims for statutory and injunctive relief under the ICFA and IDTPA, (doc. 55), and (2) motion for summary judgment on both Plaintiffs' claims for breach of contract and the Estate's claims for statutory and injunctive relief under the ADTPA, (doc. 57). The motions have been fully briefed by the parties and are ripe for decision. For the reasons that follow, the first motion for summary judgment against Carrara's Illinois Consumer Fraud and Deceptive Trade Practices Acts claims is due to be granted. (Doc. 55). The second motion for summary judgment is due to be granted in part and denied in part. (Doc. 57). The motion is due to be granted as it relates to Plaintiffs' claims for breach of contract and the

Estate's claim for injunctive relief under the ADTPA, but denied as it relates to the Estate's claims for statutory relief under the ADTPA.

## I.  SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion," relying on submissions "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).  Once the moving party has met its burden, the nonmoving party must "go beyond the pleadings" and show that there is a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 324.  At summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## II.  STATEMENT OF FACTS

Hobby Lobby is a retailer that operates over 700 stores nationally.  It sells arts, crafts, frames, small pieces of furniture, and other similar items. (Doc. 49 at ¶

8; Doc. 50 at ¶ 8).  Plaintiffs' claims arise out of their purchase of furniture (Diane Browning) and fabric (Mary Carrara).

### A.    Furniture Pricing

Hobby Lobby attaches two price tags to its furniture items.  One is a green tag showing an item number and price. (*See* Doc. 58-19 at 2).  The other is an orange tag stating that furniture is "Always 30% Off" the price displayed on the green tag.  (*Id.*).  The orange tag shows the item's 30% off price, which is identified as "Your Price" for the item.  (*Id.*).

Store signs explaining Hobby Lobby's furniture pricing are posted throughout the areas where furniture is sold.  The signs explain that furniture is always 30% off the "marked price" and that "marked prices reflect comparable prices offered by other sellers for similar products."  (Doc. 58-9 at 2-3).  The signs further explain that the "discounted price" of an item is "shown on [its] orange tag" and that the "discounts" are "provided every day."  (*Id.*).

Hobby Lobby's advertisements convey the same pricing information.  The advertisements state that furniture is "Always 30% Off the Marked Price."  (Doc. 58-10 at 2).  The same definition of "marked price" is used:  marked prices reflect "comparable prices offered by other sellers for similar products."  (*Id.*).  The advertisements likewise indicate that the "Always 30% Off" price is a "discount" provided every day.  (*Id.*).

## B. Fabric Pricing

Certain fabrics sold by Hobby Lobby—home decor fabric, fleece, and calico prints and solids—are priced and advertised the same way as furniture. In the areas of the store where fabric is sold, signs state that home decor fabric, fleece, and calico prints and solids are "Always 30% Off the Marked Price" and that these "discounts" are "provided every day." (Doc. 58-8 at 2). As with furniture, the signs explain that "marked prices reflect comparable prices offered by other sellers for similar products." (*Id.*). Hobby Lobby's advertisements convey this same information. (Doc. 58-10 at 2).

A difference with a furniture purchase and fabric purchase was the fabric ticket. When a customer purchases fabric from Hobby Lobby, the customer receives a fabric ticket that also contains pricing information. (Carrara Dep. at 45-46, 132-33;[3] Doc. 58-11). Because fabric is usually priced by the yard, the customer tells the Hobby Lobby employee working in the fabric department how many yards, or fractions of yards, she wishes to purchase; the employee records the number of yards purchased and the applicable price per yard on the fabric ticket, and then multiplies those two numbers to arrive at the total purchase price of the fabric. (Carrara Dep. at 129-59). The portion of the fabric ticket completed by the employee depends upon the price of the fabric being purchased. If the price is not

---

[3] Cararra's deposition is located at Document 58-1.

a sale, clearance, or always discounted price, the employee typically completes only the top (white) portion of the ticket. (*Id.* at 135; Doc. 58-11 at 2). When a sale, clearance, or always discounted fabric is purchased, the employee completes the bottom (pink) portion of the fabric ticket by (1) filling in the number of yards purchased, (ii) writing in the "regular price" of the fabric, (iii) computing the sale or discount percentage to arrive at the "reduced price per yard," and (iv) multiplying the number of yards by the reduced price per yard to arrive at the total purchase price. (*Id.* at 141-43, 158-59; Doc. 58-11 at 2). At the bottom of the pink part of the ticket, customers are informed that "no additional discounts or coupons are allowed on sale and clearance fabric." (Doc. 58-11 at 2).

### C. 40% Off Coupon

Hobby Lobby provides a weekly coupon for its customers' use. Customers can clip the coupon out of a newspaper advertisement, download the coupon onto their mobile cellular device, or print the coupon from Hobby Lobby's website. (Freebern Dep. at 81-83).[4] The coupon is good for "40% Off One Item at Regular Price." (Doc. 58-5 at 2-3). The term "regular price" is not defined in the coupon. (*Id.*). Certain stated restrictions apply to the coupon's use: customers are limited to one coupon per day; the coupon must be presented at the time of purchase; the

---

[4] Melissa Freebern's deposition is located at Document 58-4.

coupon cannot be used on certain items; and the coupon offer is "not valid with any other coupon, discount, or previous purchase." (*Id.*).

### D. Diane Browning's Furniture Purchase

Diane Browning purchased a small chest of drawers at the Hobby Lobby store in Jasper, Alabama, on April 2, 2016. (Doc. 58-21). The green tag attached to the chest of drawers indicated a marked price of $289.99; the orange tag reflected an "Always 30% Off" price of $202.99. (Doc. 58-19).

Mrs. Browning was given a sales receipt at the time of her purchase. (Doc. 58-21; Robin Browning Dep. at 107).[5] The receipt shows Mrs. Browning used a coupon to obtain a 40% discount on furniture marked at $289.99, that using the coupon saved her $116.00, and that the discounted price she paid after using the coupon was $173.99. (Doc. 58-21 at 2). The receipt also explains Hobby Lobby's return policy: if the original sales receipt is presented by the customer within 90 days of purchase, Hobby Lobby will exchange the merchandise, provide store credit, or issue a refund. (*Id.* at 3). Without an original receipt, the customer may either exchange the merchandise or receive a merchandise credit. (*Id.*).

When Mrs. Browning returned home, she showed her sales receipt to her husband, who immediately noticed the 40% coupon had not been applied to the chest of drawers' "always" price of $202.99. (Robin Browning Dep. at 64-65, 97-

---

[5] Robin Browning's deposition is located at Document 58-3.

101, 105-06). Instead, the receipt showed the 40% coupon had been applied to the "marked price" of $289.99. (Docs. 58-19 & 58-21; Robin Browning Dep. at 100-01, 103-06). This was evident to Mr. Browning from his examination of the receipt and the furniture tags Mrs. Browning also brought home with her. (*Id.* at 97-101).

Mr. Browning testified that he does not know whether his wife noticed or read the Hobby Lobby store signs identifying furniture as "Always 30% Off the Marked Price" and notifying customers that their "discounted price" is shown on the orange tag and that the "discounts" are "provided every day." (Robin Browning Dep. at 144-49). He also does not know whether his wife read the sales receipt at the time the time she purchased the chest of drawers, although he has no evidence that she was prevented from doing so. (*Id.* at 41, 106-08.) As far as he knows, his wife never spoke with anyone at Hobby Lobby about the price she paid for the chest of drawers. (*Id.* at 69-70).

Mrs. Browning never returned the chest of drawers to Hobby Lobby for a refund. (*Id.* at 72, 113). She continued to use the furniture after purchasing it. (*Id.* at 113).

### E. **Mary Carrara's Fabric Purchases**

Mary Carrara was a frequent shopper at Hobby Lobby, visiting the store in Peoria, Illinois, at least every other week. (Carrara Dep. at 25). She purchased

many fabric items from Hobby Lobby, including fleece, calico, and home decor fabrics. She noticed and read the store signs identifying fleece, calico, and home decor fabrics as "Always 30% Off the Marked Price."[6] (*Id.* at 76-77, 105, 107). She understood Hobby Lobby was representing that it was selling those fabric items at a 30% reduction from the comparable prices other sellers charged for similar items. (*Id.* at 115-16). She also understood that the "marked price" was not a former price previously charged by Hobby Lobby and that the 30% reduced price referenced on the signs was a discount that Hobby Lobby provided every day. (*Id.* at 110, 115, 117-18).

Mrs. Carrara frequently used a 40% off coupon when she purchased items from the Hobby Lobby store in Peoria. She usually cut the coupon out of Hobby Lobby's newspaper advertisements. (*Id.* at 70, 78). On those occasions when Mrs. Carrara used a 40% off coupon in connection with her purchase of a fabric item that was always priced at 30% off, the cashier would not apply the coupon to the "reduced price" identified on Mrs. Carrara's fabric ticket, but instead would apply the coupon to the "regular price" shown on the ticket. (*Id.* at 145-48). Mrs. Carrara acknowledged how the process worked at her deposition:

> Q.    … Say you bought a yard of a piece of fabric that had a marked price of $10. So on [the fabric ticket] in that pink section down

---

[6] The only items Mrs. Carrara purchased at Hobby Lobby that are at issue in this case are fabric items. (Carrara Dep. at 200-01). She did not purchase any of the other items that Hobby Lobby sells at "Always 30% Off" the marked price. (*Id.*).

Q. there, they would fill out one yard in the furtherest left-hand column, right?

A. Yes.

Q. Then they would put out $10 under that column "regular price," right?

Q. Yes.

Q. And then the next column, the "reduced" column, they would put $7, and then they would have one times 7, that would be $7 for that piece, is what that would cost, right?

A. Yes.

Q. So now you go up with a coupon, and … they won't give you 40 percent off, in my example, of the $7, they would only give you 40 percent off the $10, right?

A. Yes.

Q. So the cashier would then look at your fabric ticket, and in my example would say, okay, the regular marked price on that fabric is $10, you bought a yard of it, so I'm going to give you 40 percent off $10, so you'd end up paying $6 for that piece of fabric; is that right? Is that how that worked?

A. Yes.

(*Id.* at 147-48). Mrs. Carrara testified that she felt deceived when the coupon was applied in this way:

Q. … So you're saying that if some item was marked, say, 25 or 30 percent off and you used a coupon, you think you should get another 40 percent off that price; is that what you're saying?

A. The way it is advertised is that those fabrics are always 30 percent off.

Q.	Right.

A.	So what's the real price? Is it – you know, I feel like I'm getting only 10 percent off ….

Q.	[They] are not giving you 40 percent off that already-reduced price?

A.	Yeah.  If it's always 30 percent off, then what's the real price? I should get – if the fabric is $5.99, and it's always 30 percent off and it's $5.99, I should get 40 percent off that $5.99.

Q.	So you're saying if the fabric is already 30 percent off and the already 30 percent discounted price is $5.99 – is that what you're saying?

A.	The way it's worded, is they're always – the price is always 30 percent off.

...	…

A.	So then to present a 40 percent coupon for that purchase – I don't know, I feel deceived sometimes that I don't get the 40 percent off when I buy a fabric that says [always 30 percent off.]

(*Id.* at 53-55).

Mrs. Carrara was given a sales receipt each time she purchased an item at Hobby Lobby.  When she used a coupon with her purchase, the receipt would show the item the coupon was used with, the price against which the coupon was measured, the savings she received by using the coupon, and the total purchase price for the item after using the coupon.  (*Id.* at 202-04; *see, e.g.*, Docs. 58-12 at 2-3, 58-13 at 2-3, 58-15 at 2-6).  Mrs. Carrara conceded that she could clearly

discern the price from which the 40% coupon was deducted simply by reading the receipt. (Carrara Dep. at 207). She never expressed any objection to the cashier about the price she was paying. (*Id.* at 212).

Ms. Carrara never brought any of the items she purchased with a coupon back to the Hobby Lobby store to seek a refund on the basis that she had been overcharged. (*Id.* at 209-10.) She testified that she was satisfied with all of the Hobby Lobby items she purchased. (*Id.* at 74.) She made no effort to determine, either before or after she filed this lawsuit, whether she could have obtained the same or similar items from another store at prices lower than what she paid at Hobby Lobby. (*Id.* at 72-73.)

## III. ANALYSIS

There are three remaining claims in Plaintiffs' Fourth Amended Complaint: a claim by both Plaintiffs for breach of contract (Count I); a claim by the Estate for violation of the ADTPA (Count II); and a claim by Mary Carrara for violation of the ICFA and IDTPA (Count III). (Doc. 49). Hobby Lobby has moved for summary judgment on all three claims. (Docs. 55 & 57).

### A. Hobby Lobby's "Marked Prices"

Before considering each of the claims alleged by Plaintiffs in their Fourth Amended Complaint, the court will address a major point of contention between the parties: whether Plaintiffs have raised a new claim in their response to Hobby

Lobby's summary judgment motions. Resolution of this issue will impact the rest of the court's decision.

In Plaintiffs' response to Hobby Lobby's summary judgment motions, Plaintiffs argue:

> Most Hobby Lobby fabrics, and all furniture items, are marked "Always 30% Off". … It is undisputed that these items are always sold at the "Always" price.

> Despite the plainly analogous meanings of "Always" and "Regular", Hobby Lobby does not want to offer 40% off the price the merchandise is actually sold at, it wants to sell this merchandise, with a coupon, at an approximately 15% discount from the price at which the merchandise is always sold.

> In order to provide only a 15% discount off of an item, but represent that it is giving the customer a 40% discount, **Hobby Lobby creates, literally out of the heads of its buyers, a price it says is based upon "Comparable prices offered by other sellers for similar products."** Except this is not true. Hobby Lobby admits it does no survey, and has no policy to determine what "similar products" are, or what they are sold for. This conduct is definitionally deceptive.

> . . .

> Both [Plaintiffs] were told by [Hobby Lobby's] documents that the "regular" prices were the "comparable" prices. **Neither Plaintiff had any way to know that Hobby Lobby had no idea what comparable prices were, but paid 40% off of the merchandise at that price, instead of getting 40% off the true regular price**. This pricing scheme creates liability for breach of contract, and under the Alabama and Illinois Deceptive Trade Practices Acts.

(Doc. 67 at 2-3) (emphasis added). Plaintiffs repeat these allegations throughout their brief. (*See id.* at 10-13, 16, 18-19, 39, 47-49, 54, 56-57, & 59). They also

argue that Hobby Lobby's alleged "pricing scheme" violated pricing regulations found in federal and Illinois law. (*Id.* at 32-36, 52-55).

In its reply brief, Hobby Lobby cries foul. Hobby Lobby asserts that Plaintiffs' "new" allegations are not found anywhere in any of Plaintiffs' five complaints. (Doc. 74 at 2). Hobby Lobby argues that the "entire thrust of each complaint was that Hobby Lobby broke contracts and deceived Plaintiffs simply by not giving them another 40% discount on top of the "Always 30% [Off]" discounts that ordinarily applied to the fabric and furniture items they purchased." (*Id.* at 2-3). Hobby Lobby contends that "[n]o claim in any of the complaints alerted Hobby Lobby of the need to marshal evidence to defend against the theory that its 'marked prices' were bogus because they were not related to prices its competitors charged for similar merchandise." (*Id.*) Hobby Lobby also notes that "[t]here were no references [in any of Plaintiffs' complaints] to the federal or Illinois regulations cited in Plaintiffs' response brief, or [to] how Hobby Lobby's use of 'comparable prices' charged by others were impacted by those regulations." (*Id.* at 2). Hobby Lobby thus argues that the court should disregard Plaintiffs' "new claims" raised for the first time in their response brief.[7]

---

[7] Hobby Lobby separately argues that Plaintiffs have "blatantly distorted" the process by which it sets its "marked prices" and that the court should also reject Plaintiffs' arguments about "fictional marked prices" on substantive grounds. (Doc. 74 at 6-9).

As this court has noted elsewhere, "a summary judgment memorandum is not a proper vehicle for amending the pleadings." *McKenzie v. Talladega Bd. of Educ.*, 242 F. Supp. 3d 1244, 1255 n.12 (N.D. Ala. 2017); *see Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint in a brief opposing summary judgment.").  That is what Plaintiffs are seeking to do here.  Plaintiffs do not allege anywhere in their Fourth Amended Complaint—or in any of their preceding complaints—that they were deceived by Hobby Lobby's representation that the "marked prices" of items priced "Always 30% Off" reflected "comparable prices offered by other sellers for similar products."  Rather, they allege that they were deceived by Hobby Lobby's representation that it would apply its 40% off coupon to an item's "regular price," which they contend is the item's "Always 30% Off" price and the price to which the coupon should have been applied.  (*See, e.g.*, Doc. 49 at ¶ 53 ("Mrs. Browning should have gotten forty percent (40%) off of the 'Always' price, because that is the regular price of the goods."; Doc. 49 at ¶ 62 ("Mrs. Carrara should have gotten 40% off of the 'Always' price that is the 'regular' price of the goods, instead of 40% off of the 'never' price, which cannot be considered the 'regular' price of the goods.")).  In other words, the allegations in Plaintiffs' complaint relate to the manner in which Hobby Lobby applies its coupon, not to the manner in which Hobby Lobby determines an item's "marked price."  Indeed, nowhere in Plaintiffs'

Fourth Amended Complaint do they make any reference to Hobby Lobby's use of "comparable prices" as the basis for its "marked prices." There is no allegation that Hobby Lobby has "no idea" what its competitors' "comparable prices" truly are; no allegation that the "marked prices" charged by Hobby Lobby are based on unsubstantiated "comparable prices" that no other sellers charge; and no allegation that Hobby Lobby's use of unsubstantiated "comparable prices" to arrive at its "marked prices" runs afoul of federal and Illinois pricing regulations. These are new allegations that seek to change the very nature of this case.

The court recognizes that Plaintiffs do allege in their Fourth Amended Complaint that "Hobby Lobby's 'regular' price is an artificially inflated price at which the merchandise has never been sold by Hobby Lobby. Rather, it is a fiction created by Hobby Lobby."[8] (Doc. 49 at ¶ 10) (emphasis in original). However, as Hobby Lobby aptly states it in its reply brief, "[T]his is just a rinse and repeat of Plaintiffs' familiar refrain about 'always' and 'never' prices—i.e., their claims that the marked price is a 'fiction' because it is <u>never</u> charged to Hobby Lobby customers. There are no factual allegations anywhere that Hobby Lobby's non-

---

[8] Plaintiffs assert in their brief that "[the Estate's] claim is that Hobby Lobby advertises and marks furniture items with artificially inflated fictitious prices, never sold by it, **or any other retailer**." (Doc. 67 at 30) (emphasis added). That is not what is alleged in their complaint. As quoted above, the allegation in Plaintiffs' complaint is that "Hobby Lobby's 'regular' price is an artificially inflated price at which the merchandise has never been sold by Hobby Lobby." (Doc. 49 at ¶ 10). There is no allegation that the "regular" price is an "artificially inflated price" because it is never sold by "any other retailer."

discounted 'marked price' is a fictional price because it is <u>higher</u> than what other sellers sell for similar merchandise." (Doc. 74 at 3) (emphasis in original) (footnote omitted). The court agrees with Hobby Lobby.

If Plaintiffs had wished to bring a claim against Hobby Lobby for engaging in a deceptive trade practice in the way it sets its "marked prices," they could have and should have done so. They did not. They never moved for leave to amend any of their complaints to add such a claim. It is also quite telling that Plaintiffs have offered no admissible evidence showing that the "comparable prices" offered by other sellers for similar merchandise were lower than Hobby Lobby's "marked prices."[9] They have offered no market studies or similar evidence establishing what other retailers were charging during the relevant periods when Diane Browning and Mary Carrara purchased their merchandise from Hobby Lobby. The absence of such evidence is further confirmation that Plaintiffs' current allegations regarding the allegedly deceptive way in which Hobby Lobby arrives at its "marked prices" are new allegations raised by Plaintiffs after the fact.

---

[9] In opposition to Hobby Lobby's motion for summary judgment, the Estate has submitted screen shots from the Amazon web-site purporting to show prices of some chests that it claims are priced lower than the marked price of the furniture Mrs. Browning purchased. (Doc. 67-13). The screen shots are inadmissible for a number of reasons. First, they are not authenticated. Second, they have been offered to prove the truth of the matter asserted – the actual price of the items displayed – and no evidence has been offered to establish the business records exception. *See* Fed. R. Evid. 801(c) and 803(6). Third, they are incomplete duplicates, as several of the screenshots are obscured. *See* Fed. R. Evid. 1003. They also do not reflect prices in effect at the time Mrs. Browning purchased her furniture from Hobby Lobby on April 2, 2016. (Doc. 58-21).

Plaintiffs cannot present a new claim or legal theory after Hobby Lobby has moved for summary judgment. Again, the focus of all of their complaints has been on how Hobby Lobby applies its 40% off coupon to items priced "Always 30% Off", not on how Hobby Lobby arrives at an item's "marked price." Accordingly, the court will disregard Plaintiffs' allegations and arguments regarding the manner in which Hobby Lobby establishes its "marked prices" and will not consider such allegations and arguments in its analysis of Plaintiffs' claims, including Plaintiffs' allegation that Hobby Lobby's reference to "comparable prices offered by other sellers" is a deceptive practice that violates federal and Illinois pricing regulations. That allegation cannot be found anywhere in Plaintiffs' Fourth Amended Complaint. The court addresses Plaintiffs' claims as they are presented in the Fourth Amended Complaint.

### B. Breach of Contract

Plaintiffs' first claim is for breach of contract. Under both Alabama and Illinois law, the first element of a claim for breach of contract is a valid contract binding both parties. *Benton v. Clegg Land Co.*, 99 So. 3d 872, 883 (Ala. 2012) (the elements of a claim for breach of contract are a valid contract binding both parties, the plaintiff's performance of the contract, the defendant's nonperformance, and resulting damages); *see also Roberts v. Columbia Coll. Chicago*, 821 F.3d 855, 863 (7th Cir. 2016) (to support a breach of contract claim

under Illinois law, a plaintiff must prove: a valid and enforceable contract, performance by the plaintiff, breach by the defendant, and resultant damages). A valid and binding contract requires "an offer and an acceptance, consideration, and mutual assent to the essential terms of the agreement." *Stacey v. Peed*, 142 So. 3d 529, 531 (Ala. 2013) (internal quotation marks and citation omitted); *see also Fries v. United Mine Workers*, 333 N.E. 2d 600, 604 (Ill. App. 1975). "It is well settled that whether parties have entered a contract is determined by reference to the reasonable meaning of the parties' external and objective actions." *SGB Constr. Servs., Inc. v. Ray Sumlin Constr. Co.*, 644 So. 2d 892, 895 (Ala. 1994).

Here, the parties agree a contract was formed when Diane Browning and Mary Carrara purchased their merchandise from Hobby Lobby using a 40% off coupon. They disagree, however, on whether there was a mutual assent to the contract terms. Hobby Lobby argues that Plaintiffs cannot prevail on their breach of contract claim because "[t]heir actions manifested assent to a contract based on Hobby Lobby's position—the regular price [of an item] is the "Marked Price" and the coupon [cannot] be used to obtain an additional 40% discount on items that are always discounted by 30%." (Doc. 59 at 22). Plaintiffs respond that there is a dispute "as to just what [they] assented to" and that this dispute precludes summary judgment. (Doc. 67 at 25). The court disagrees with Plaintiffs.

"[T]he law of contracts is premised upon an objective rather than a subjective manifestation of intent approach." *Lilley v. Gonzalez*, 417 So. 2d 161, 163 (Ala. 1982); *see also* 2 *Williston on Contracts* § 6:3 (4th ed. 2007) (formation of a contract usually depends on an "outward, objective manifestation of assent"). "The manifestation of assent may be made wholly or partly by written or spoken words or by other acts or failure to act." *Restatement (Second) of Contracts* § 19(1) (1981). A party's conduct is critical, because conduct "may manifest assent even though [the party] does not in fact consent." *Id.* §19(2); *accord Baker v. Elmwood Distrib., Inc.*, 940 F.2d 1013, 1017 (7th Cir. 1991) (even if there is a clash of "subjective understandings" about a contract, the focus is on the parties' conduct and whether those manifested assent).

Here, the core thesis of Plaintiffs' breach of contract claim is that they never assented to Hobby Lobby's position on the coupon's terms. Specifically, Plaintiffs contend that they never assented to Hobby Lobby's position that the "regular price" of an item is the item's "marked price." Instead they contend the "regular price" of the item is the price for which the item is "always" sold, the 30% off price. Their conduct, however, tells a different story. It is undisputed that each time Diane Browning and Mary Carrara presented a 40% off coupon to purchase an item that was always discounted by 30%, Hobby Lobby applied the coupon to the item's marked price; Mrs. Browning and Mrs. Carrara voluntarily paid the

price they were charged without objection; and they were given a receipt showing exactly what they paid and how the price was calculated. Each receipt confirmed that the 40% coupon discount had been deducted from the "marked price." By paying the price reflected on the receipt, Mrs. Carrara and Mrs. Browning evidenced their outward, objective manifestation of assent to the price Hobby Lobby charged. *See Mobile Attic, Inc. v. Kiddin' Around of Ala., Inc.*, 72 So. 3d 37, 45 (Ala. Civ. App. 2011) ("[T]he actions of the parties in reference to the contract can form the basis of mutual assent; that is, when the conduct of one party is such that the other party may reasonably draw the inference of assent to the agreement, that conduct is effective as assent."); *accord First Valley Leasing, Inc. v. Goushy*, 795 F. Supp. 693, 697 (D.N.J. 1992) (payment of items listed on plaintiffs' invoices indicated acceptance of the offer and formation of a valid contract).

Moreover, there is no evidence that either Diane Browning or Mary Carrara ever communicated their contrary interpretation of the coupon's terms to any Hobby Lobby employee prior to purchase. Indeed, there is no evidence that any Hobby Lobby employee was aware that either Mrs. Browning or Mrs. Carrara was interpreting the coupon's terms in a manner that was inconsistent with Hobby Lobby's construction and application of the coupon. Regardless of what Mrs. Browning and Mrs. Carrara may have believed or intended to say about the

coupon, the actual agreement the parties reached is evidenced by what Mrs. Browning and Mrs. Carrara voluntarily paid for the items at issue, as reflected on the receipts given to them. *See Mercedes-Benz Int'l, Inc. v. Cobasys, LLC*, 605 F. Supp. 2d 1189, 1202 (N.D. Ala. 2009) ("[I]t is the reasonable meaning of the parties' external and objective actions, rather than what they intended to say, that governs the question of mutual assent." (internal quotations and citation omitted)); *see also Mobile Attic*, 72 So. 3d at 45 ("Neither the uncommunicated beliefs of a party nor any misunderstandings regarding the import of particular terms prevent an objective manifestation of assent from being effective.").

In sum, Diane Browning and Mary Carrara voluntarily paid the price they were charged by Hobby Lobby for their merchandise, they were given receipts showing exactly what they paid and how the price was computed, and they never complained to store personnel about the amount they paid or how their coupon was applied. In addition, they never returned any of their merchandise to Hobby Lobby for a refund. Consequently, Plaintiffs cannot show that Hobby Lobby breached any contract. Summary judgment is due to be granted on their claims for breach of contract.

## C. The Alabama Deceptive Trade Practices Act[10]

The Alabama Deceptive Trade Practices Act ("ADTPA"), Ala. Code § 8–19–1 *et seq*., is a consumer protection statute designed to punish persons who engage in deceptive trade practices. As relevant here, the ADTPA provides that it is unlawful for a seller to make "a false or misleading statement of fact concerning the reasons for, existence of, or amounts of, price reductions." ALA. CODE § 8-19-5(11). The ADTPA is a statutory substitute for fraud claims in the specific circumstances set forth in § 8-19-5. A plaintiff cannot pursue both a statutory or common law fraud claim together with a claim under ADTPA. *See* Ala. Code § 8-19-15; *Sam v. Beaird*, 685 So. 2d 742, 744 (Ala. 1996).

Cases interpreting the requirements of the ADTPA are few and far between. In fact, the court could not find, and the parties do not cite, any case dealing specifically with the section of the ADTPA at issue here, § 8-19-5(11). As such, other than the statutory language, the court has little guidance on what a plaintiff must establish to survive a motion for summary judgment on a claim under § 18-19-5(11). Although Defendant asserts Plaintiff must still prove certain essential fraud elements, including the presence of a misrepresentation or omission, intent to deceive, deception, proximate causation and damages, the cases cited by Defendant

---

[10] Although the Fourth Amended Complaint purports to state a class action under this statute, (doc. 49 at 15-16), the ADTPA explicitly disallows class actions brought by private parties: "[a] consumer or other person bringing an action under this chapter may not bring an action on behalf of a class." Ala. Code. § 8-19-10(f).

do not so hold.  *See Jackson v. CIT Grp./Sales Financing, Inc.*, 630 So. 2d 368, 373 (Ala. 1993); *Lynn v. Fort McClellan Credit Union*, 2013 WL 5707372, at *6-7 (N.D. Ala. Oct. 21, 2013).  Instead, both cases look to the language in the statute to ascertain what a Plaintiff must establish.  The court follows this approach.

The Estate contends Hobby Lobby violated the ADPTA by applying Diane Browning's 40% off the "regular" price coupon to the "marked" price of $289.99, rather than the "Always 30% Off" price of $202.99, which the Estate claims was the true "regular" price of the merchandise. (Doc. 49 at ¶¶ 17-19, 53).  Hobby Lobby argues that the Estate's ADPTA claim is due to be dismissed because the Estate cannot establish that Hobby Lobby made any false or misleading statements to Mrs. Browning.[11]

---

[11] The court rejects Hobby Lobby's arguments that the Estate's ADPTA claim fails because (1) there is no evidence that Hobby Lobby intended to deceive Mrs. Browning; (2) there is no substantial evidence that any deceptive action or statement by Hobby Lobby caused Mrs. Browning any compensable loss; and (3) the Estate cannot predicate its ADTPA claim on Hobby Lobby's alleged failure to honor the contractual promise it made in its coupon. (Doc. 59 at 27-32).  First, § 8-19-5(11) does not include any requirement that a plaintiff show an "intent to deceive" on behalf of a defendant.  Even if that requirement was somehow implied, whether or not Hobby Lobby intended to deceive Mrs. Browning is a question of fact for the jury to decide.  The mere fact that Mrs. Browning did not present affirmative evidence of a specific intent is irrelevant.  Second, Mrs. Browning suffered a compensable loss in that she paid more for the chest than she would have paid if the 40% coupon was applied to the "always" price.  The monetary damage is clear and easily calculable.  Finally, the court is not persuaded that the Estate's allegations as they relate to the ADTPA essentially amount to a claim for breach of contract.  Instead, the allegations fall within those practices proscribed by § 8-19-5(11).

Here, there is a question of fact as to whether Hobby Lobby made any false or misleading statements[12] to Mrs. Browning that could give rise to liability under the ADTPA. While the price tags and advertisements in and of themselves do not contain any false or misleading statements, the statements therein, when combined with the statements in the 40% off coupon create a jury question. The collective use of the "marked price," "always price" and the "regular price" necessarily creates confusion on the part of the consumer that a reasonable juror could conclude equates with a "misleading statement of fact concerning the . . . amount of [the] price reductions." Ala. Code § 9-18-5(11).

The court is not persuaded that the coupon's statement that it is not valid with any other "discount" somehow clarifies the coupon's application. Again, a question of fact exists as to whether the orange tag stating "Furniture Always 30% Off" necessarily means it was a "discount" or if it was the "regular" price charged for that piece of furniture. This is especially true when the price on the orange tag was the only price for which the furniture was sold. Therefore, the court concludes a question of fact exists as to whether Hobby Lobby made any false or misleading statement to Mrs. Browning that could support a claim for violation of the ADPTA. Summary judgment is due to be denied as to the Estate's ADTPA claim for statutory relief.

---

[12] There is no evidence that any Hobby Lobby employees made any false or misleading oral statements to Mrs. Browning.

That being said, the court agrees with Hobby Lobby that the Estate is not entitled to any injunctive relief under the ADTPA because the Estate does not have standing to seek injunctive relief. Plaintiff does not reply to Hobby Lobby's standing argument. To establish standing for injunctive relief, a plaintiff "must show a sufficient likelihood that he will be affected by the allegedly unlawful conduct in the future." *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1328 (11th Cir. 2013) (internal quotation marks omitted). Standing for injunctive relief depends on "a real and immediate—as opposed to a merely conjectural or hypothetical—threat of future injury." *Id*. at 1334 (internal quotation marks omitted). There is no evidence, or even an allegation in the Fourth Amended Complaint, that the Estate will ever purchase furniture from Hobby Lobby again. Additionally, Robin Browning, executor of the Estate, testified he has only been to Hobby Lobby once with his wife, never returned since the lawsuit was filed, and never intends to return. (Robin Browning Dep. at 31-32, 58, 94). Hobby Lobby's summary judgment motion, as it relates to injunctive relief under ADTPA, is due to be granted.

### D. The Illinois Consumer Fraud and Deceptive Trade Practices Acts

#### 1. ICFA

Mary Carrara brings a similar claim under the Illinois Consumer Fraud Act. She alleges that, when she purchased fabric items marked "Always X% Off" and

presented a 40% off coupon at the time of her purchase, Hobby Lobby violated the ICFA by applying the coupon discount to the higher price displayed on the item the "marked price", rather than the lower "Always" price. (Doc. 49 at ¶¶ 25-26, 58-62). Hobby Lobby has moved for summary judgment on this claim as well.

To prevail under the ICFA, a plaintiff must establish that: "(1) the defendant engaged in a deceptive act or practice; (2) the defendant intended that the plaintiff rely on the deception; (3) the deception occurred in the course of trade and commerce; (4) actual damage to the plaintiff occurred; and (5) the damage was proximately caused by the deception." *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 883 (7th Cir. 2005); *see Zekman v. Direct Am. Marketers, Inc.*, 695 N.E.2d 853, 860-61 (Ill. 1998). Hobby Lobby argues that Mrs. Carrara cannot establish several of these elements. The court need only address the first element.

To maintain an action under the ICFA, "the plaintiff must actually be deceived by a statement or omission that is made by the defendant." *De Bouse v. Bayer*, 922 N.E.2d 309, 316 (Ill. 2009). The allegedly deceptive statement or omission "must be looked upon in light of the totality of the information made available to the plaintiff." *Davis*, 396 F.3d at 884; *Tudor v. Jewel Food Stores, Inc.*, 681 N.E.2d 6, 8 (Ill. App. Ct. 1997). In other words, "a statement that would have been deceptive in isolation can be non-deceptive when placed in context." *Muir v. Playtex Prods., LLC*, 983 F. Supp. 2d 980, 988 (N.D. Ill. 2013).

Here, the totality of information available to Mrs. Carrara dooms her ICFA claim. Although the same coupon was used with regard to the fabric purchased by Mrs. Carrara as was used by Mrs. Browning, there is one key difference – the fabric ticket. At the top of the fabric ticket, there were three columns: yards, regular price, and total. (Doc. 58-11 at 2). The section relating to the sale and clearance fabrics contained four columns: yards, regular price, reduced price, and total. (*Id*.). It is undisputed that the fabric ticket given to Ms. Carrara before she purchased fabric marked at "Always 30% Off" listed the "marked price" under the column labeled "regular price" on the ticket. (*See* Doc. 58-12 at 2-3). This fact eliminates the possibility of deception as a matter of law.

Other courts applying the ICFA have found no deception under similar circumstances. *See, e.g.*, *Clark v. Experian Information Solutions, Inc.*, 256 F. App'x 818, 823 (7th Cir. 2007) (affirming dismissal of the plaintiff's ICFA claim, where the plaintiff was exposed to information (a website disclosure) that provided the information he alleged was not disclosed); *Ibarrola v. Kind, LLC*, 83 F. Supp. 3d 751, 759 (N.D. Ill. 2015) (dismissing ICFA claim of plaintiff who claimed she was deceived by the defendant's use of the term "no refined sugars" on its product label, where she "should have considered the other information she encountered on the product's packaging"); *Davis*, 396 F.3d at 884 (no deception where plaintiff was alerted in a "number of ways" that her understanding was inconsistent with the

defendant's other disclosures).  As such, Hobby Lobby is entitled to summary judgment on Mrs. Carrara's ICFA claim.[13]

## 2.    IDTPA

Along with her ICFA claim, Mrs. Carrara seeks injunctive relief under the Illinois Deceptive Trade Practices Act.  Under Section 2 of the IDTPA, a person may violate the statute in a number of explicit ways.  *See* 815 Ill. Comp. Stat. 510/2(a)(11).  The sole remedy for these statutory violations is injunctive relief (plus attorneys' fees).  815 Ill. Comp. Stat. 510/3.

The IDTPA "was not intended to be a consumer protection statute but, rather, was intended to prohibit unfair competition" among businesses.  *Robinson v. Toyota Motor Credit Corp.*, 735 N.E.2d 724, 735 (Ill. App. Ct. 2000), *aff'd in relevant part*, 775 N.E.2d 951 (2002).  "It is primarily directed toward acts which unreasonably interfere with another's conduct of his business."  *Popp v. Cash Station, Inc.*, 613 N.E.2d 1150, 1156 (Ill. App. Ct. 1992).  A consumer action is possible under the IDTPA, however, in limited circumstances where a consumer can show that she is likely to be damaged in the future by a deceptive practice of the defendant.  *Id.*; *accord Howard v. Chicago Transit Auth,,* 931 N.E.2d 292, 299 (Ill. App. Ct. 2010).

---

[13] As part of her ICFA clam, Mrs. Carrara seeks injunctive relief in addition to damages. Because she has no valid ICFA claim as discussed above, she is not entitled to any injunctive relief under the ICFA. *See Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 740 (7th Cir. 2014) ("Absent a showing of a violation of ICFA, a plaintiff is not entitled to injunctive relief.").

"'The problem in most consumer actions under the [IDTPA] is the inability to allege facts indicating the likelihood of damage in the future.'" *Aliano v. Louisville Distilling Co.*, 115 F. Supp. 3d 921, 928 (N.D. Ill. 2015) (quoting *Howard*, 931 N.E.2d at 299). Where the plaintiff is aware of the alleged deceptive practice at the time she files suit, as is the case here, courts have refused to grant injunctive relief because the possibility for future deception of the plaintiff has ended. *See, e.g., McDonnell v. Nature's Way Prods., LLC*, 2017 WL 1149336, at *2 (N.D. Ill. Mar. 28, 2017) (plaintiff's "present awareness of Nature's Way's alleged deceptive labeling practices—as evidenced by the filing of this lawsuit— means she is unlikely to be harmed in the future by Nature's Way's labeling claims"); *Demedicis v. CVS Health Corp.*, 2017 WL 569157, at *2 (N.D. Ill. Feb. 13, 2017) (dismissing injunctive relief claim because the plaintiff, currently aware of the defendant's allegedly deceptive practices, was not likely to be harmed in the future); *Aliano*, 115 F. Supp. 3d at 929 (noting the lack of "any authority suggesting that a plaintiff can obtain injunctive relief under the [IDTPA] when the plaintiff itself will not be deceived or confused in the future"); *Howard*, 931 N.E.2d at 299; *Popp*, 613 N.E.2d at 1157.

Ms. Carrara's claim for injunctive relief under the IDTPA fails for the same reason. She has effectively conceded that she will not be deceived in the future, because she is presently aware of Hobby Lobby's practices concerning the

application of its 40% off coupon.  (Carrara Dep. at 97-98.)  Her request for injunctive relief, therefore, fails.

## IV.    CONCLUSION

For the foregoing reasons, Hobby Lobby's motion for summary judgment against Carrara's Illinois Consumer Fraud and Deceptive Trade Practices Acts claims is due to be granted.  (Doc. 55).  Hobby Lobby's second motion for summary judgment is due to be granted in part and denied in part. (Doc. 57).  The motion is due to be granted as it relates to Plaintiffs' claims for breach of contract and the Estate's claim for injunctive relief under the ADTPA, but denied as it relates to the Estate's claims for statutory relief under the ADTPA.  A separate order consistent with this opinion will be entered.

**DATED** this 27th day of September, 2018.

_____
**JOHN E. OTT**
Chief United States Magistrate Judge