FILED
2021 Jun-22  PM 03:42
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **DAVID PHILLIPS, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.:** |
| | ) | **2:16-cv-837-JHE** |
| **HOBBY LOBBY STORES, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

| | | |
|---|---|---|
| **STEVEN D. MARCRUM,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.:** |
| | ) | **2:18-cv-01645-JHE** |
| **HOBBY LOBBY STORES, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## PLAINTIFFS' UNOPPOSED CONSOLIDATED MOTION FOR FINAL APPROVAL OF SETTLEMENTS, AND PETITION FOR AWARD OF FEES AND EXPENSES

Plaintiffs Robin Browning, as the Executor of the Estate of Diane Browning,

and Steven Marcrum, state the following as their Unopposed Consolidated Motion

1

For Final Approval of Settlements, and Petition for Award of Attorney's Fees and Expenses.[1]

# I. <u>INTRODUCTION AND SUMMARY</u>

As set forth in the Consolidated Memorandum in Support of Motion for Preliminary Approval, Doc. 152, the settlement of these actions comes after extensive and hard-fought litigation for now five years, with the assistance of mediator James Pratt. The settlement is a fair and reasonable compromise of protracted litigation pending in two cases, consolidated in this Court, of classes of customers in Alabama and Florida over class periods corresponding to the Statute of Limitations for causes of action asserted under the Alabama Deceptive Trade Practices Act ("ADTPA"), Ala. Code § 8-19-1 (1975), <u>et</u> <u>seq</u>. and the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. Ann. § 501.201, <u>et</u> <u>seq</u>.  The Settlement Agreements are of record as Docs. 150-1 and 151-1.

---

[1] While the cases have been consolidated, Doc. 83, they remain two separate actions.  Two separate Motions for Preliminary Approval were filed, Docs. 155, 156 and two separate Preliminary Approval Orders, were entered.  Docs. 155, and 156.  However, because the issues entirely overlap, and because the facts are almost entirely duplicative, Plaintiffs Browning and Marcrum file this single, Consolidated Motion for Final Approval of Settlements, and Petition for Award of Attorneys' Fees and Expenses in both cases, for approval in both cases. The term "Consolidated Cases" as used herein, means both actions, <u>Phillips v. Hobby Lobby, Inc.</u>, Case No. 2:16-cv-837-JHE, and <u>Marcrum v. Hobby Lobby, Inc.</u>, Case No. 2:18-cv-01645-JHE.

A.    **The Litigation.**

The consolidated cases revolve around purchases of furniture at Hobby Lobby retail locations in Alabama and Florida using a 40% off coupon that Hobby Lobby has distributed for years. Freebern depo., Doc. 152-3, p. 4. The coupon is in substantially the following form:



All furniture items are marked "30% off". Doc. 152-3, p. 3. The policy for pricing and marking furniture is corporate wide, and is followed by all Hobby Lobby retail stores. Doc. 152-3, p. 3. The uniform tagging policy is depicted on the tags for the item purchased by Diane Browning, shown below.

3



The "green tag" (top) depicted above is affixed to the furniture items at manufacturing facilities, usually in China.  Doc. 152-3., pp. 4-5; 10-11.  When the furniture arrives at the Hobby Lobby retail locations, Hobby Lobby personnel affix the "orange tag" (bottom) to the item.  Doc. 152-4.

If a customer comes in to purchase the furniture item, without a coupon, the "Always 30% off price is charged.  Kinard depo., Doc. 152-5, p. 3; Doc. 152-3, p. 11.  The question in this case is whether, when a purchaser used a coupon, the 40% off should be applied to the higher, green-tag price, or the "always 30% off" price, when the language of the coupon says that it "is good for one item at regular price only . . ." [and] is not valid with any other coupon, discount, or previous purchase." Plaintiffs have taken the position that the "regular price" is the "always 30% off"

price charged every day, while Defendant has taken the position that the furniture has already been discounted; and hence the terms of the coupon prohibit its application to the orange tag price.

### 1.    The Browning Case.

On May 18, 2016, Diane Browning filed a Class Action Complaint[2] against Hobby Lobby.  Doc. 1.[3]  The Complaint contained causes of action on behalf of an Alabama class under Alabama common law for Breach of Contract, as well as a claim that Hobby Lobby violated the ADTPA at Ala. Code § 8-19-5(11)(1975), actionable under 8-19-10(a).

### 2.    Motion to Dismiss Practice.

Defendant filed a Motion to Dismiss the Second Amended Browning Complaint, Doc. 27, with a supporting Memorandum, Doc. 28.  Plaintiff opposed the Motion.  Doc. 29.  At issue in the motion was not only the validity of the Complaint, writ large, but whether a single Alabama class representative could represent putative class members residing in multiple states under the various state law iterations of the Uniform Deceptive Trade Practices Act.  The Court denied the

---

[2] Diane Browning passed away during the pendency of this case.  A Suggestion of Death was filed, and Mrs. Browning's husband, Robin Browning, the Representative of her Estate, was properly substituted as a party on November 26, 2016.  Doc. 40.

[3] The Complaint regarding the ADTPA was amended three times.  The references herein to "the Complaint" are to the Fourth Amended Class Action Complaint.  Doc. 49.

Motion as to the merits of the Alabama Breach of Contract and ADTPA claims, but held that if class claims state Deceptive Trade Practices Act were going to proceed, there would need to be a separate class representative for each state.  Doc. 37.  This is the ruling that eventually precipitated the filing of claims by Ms. Carrara for an Illinois class, and Ms. Calama for a Georgia class, and eventually by Steven Marcrum on behalf of a Florida class.

### 3.    The Marcrum Case.

On June 4, 2018, while Defendant's Motion for Summary Judgment, see infra, was pending in the Browning action, Steven Marcrum filed his action in the United States District Court for the Northern District of Florida, alleging essentially the same fact pattern as Robin Browning.  Doc. 94.[4]  He brought alternative class claims for Breach of Contract and Unjust Enrichment under Florida common law, and class claims under FDUTPA. Doc. 94. By agreement, this action was eventually transferred to this District, and consolidated with the existing Alabama case.  Doc. 83.

### 4.    Summary Judgment Practice.

Three separate summary judgment motions were filed in this case, all of which were extensively briefed.  On December 22, 2017, Hobby Lobby filed a Motion for

---

[4]  This reference is to the now operative Second Amended Class Action Complaint filed by Mr. Marcrum in this case.

Summary Judgment.  Doc. 55, and supporting Memorandum.  Doc. 56, on claims of then plaintiff Carrara; and a separate Motion, Doc. 57, and supporting Memorandum, Doc. 59, on the claims of Robin Browning.  Plaintiffs filed a lengthy opposition to both Motions, Doc. 67, and the Court was provided with replies and a Sur-reply.  Docs. 74, 77.

In addition to the Browning and Carrara Summary Judgment Motions, Hobby Lobby filed a Motion for Summary Judgment, Doc. 100, and Memorandum in Support, Doc. 102, on the claims of Steven Marcrum under Florida law, which was extensively briefed by the parties.  Docs. 38, 114.

The Court entered two Orders on the above-referenced Summary Judgment Motions, Docs. 78.  The Court dismissed then plaintiff Carrara's claims in their entirety.  However, the Court denied the Motions for Summary Judgment as to the claims under ADTPA (Browning), and FDUTPA (Marcrum), in Orders dated October 5, 2018, and December 16, 2019.

### 5.    Litigation Regarding The Viability of Class Actions Under The Alabama Deceptive Trade Practices Act.

There was a question in this case as to whether, pursuant to Lisk v. Lumber One Wood Preserving, 792 F.3d 1331 (11th Cir. 2015), a class action may proceed on claims under the ADTPA despite the language in Ala. Code § 8-19-10(f) providing that class actions may not be brought by consumers.  On July 15, 2019,

Hobby Lobby filed a Motion to Deny Class Certification, Doc. 103, and a Supporting Memorandum, Doc. 104, arguing that the ADTPA's ban on consumer class actions is effective, and that this case could not be certified. This Motion was opposed, and thoroughly briefed. Doc. 108. On September 30, 2019, the Court entered an Order, Doc. 116, denying the Motion, paving the way for a Motion for Class Certification to be filed.

### B.      The Mediation Process.

The parties agreed to mediate this case before Honorable James Pratt, prior to the class certification process. Mediator Pratt conducted a mediation, attended by counsel and a representative of Hobby Lobby in Birmingham, Alabama, on February 25, 2020. Pratt Declaration, Doc. 152-6, p. 5, ¶ 12. The mediation session lasted over ten (10) hours, and resulted in an agreement in principle on most of the issues in the case, Clark Decl., Doc. 152-7, p. 7, ¶ 18.

The parties began the process of negotiating the remaining issues, namely an agreement as to expense reimbursement and an attorney's fee, directly, in early March of 2020. Doc. 152-7, pp. 7-8, ¶¶ 19-22.

As the entire globe is aware, the Coronavirus pandemic arrived in the United States at about this time, effectively shutting down commerce in the country. Hobby

Lobby had to close its retail stores for months, and simply was not in a position to negotiate further until it could get its feet back on the ground and have some clarity as to what the immediate future would look like.  Doc. 152-7, p. 9, ¶ 19.  By July of 2020, Hobby Lobby was able to re-open most of its stores, and the parties were able to resume negotiating the final details of the settlement.  Doc.  152-7, p. 8, ¶ 20.  This took the form of numerous phone conferences and written proposals to the mediator. Doc. 152-7, p. 8, ¶¶ 20-22.

Finally, on November 20, 2020, the parties were able to come to an agreement in principle to settle all aspects of the case, Doc. 152-6, that has now been reduced to the Settlement Agreements.

## II.  <u>The Settlement</u>

### A.    <u>Overview of the Two Settlements</u>.

#### 1.    <u>Class Definitions</u>.

Pursuant to Fed. R. Civ. P. 23(b)(3), the Settlement Agreement contemplates Certification of the following classes in the cases:

##### a.    <u>The Alabama Class</u>.

The Settlement Class agreed to the Alabama case as follows:

All persons or entities who purchased furniture at a Hobby Lobby store in Alabama between the dates of May 19, 2015 and October 2, 2017, and in connection with that purchase, used a Hobby Lobby 40%

coupon. These persons or entities will be referred to as "Settlement Class Members."

Excluded from the Settlement Class are those persons or entities (a) who had claims pending against Hobby Lobby before either a federal or state court as of the date of Preliminary Approval, where those claims related in any way to the Hobby Lobby 40% coupon; (b) who previously released all claims against Hobby Lobby; (c) who had previously settled any claims they pursued (or could have pursued) against Hobby Lobby, where the suits or claims were independent and unconnected to any Settlement Agreement reached in this case; or (d) who are Hobby Lobby agents or employees, or are family members of Hobby Lobby agents or employees, or who are otherwise affiliated with Hobby Lobby.

Doc. 150-1, pp. 14-15, ¶ 6.

### b. **The Florida Class**.

The Settlement Class agreed to in the <u>Marcrum</u> case, covering Hobby Lobby's

Florida stores, is as follows:

All persons or entities who purchased furniture at a Hobby Lobby store in Florida between the dates of June 4, 2014 and October 2, 2017, and in connection with that purchase, used a Hobby Lobby 40% coupon. These persons or entities will be referred to as "Settlement Class Members."

Excluded from the Settlement Class are those persons or entities (a) who had claims pending against Hobby Lobby before either a federal or state court as of the date of Preliminary Approval, where those claims related in any way to the Hobby Lobby 40% coupon; (b) who previously released all claims against Hobby Lobby; (c) who had previously settled any claims they pursued (or could have pursued) against Hobby Lobby, where the suits or claims were independent and unconnected to any Settlement Agreement reached in this case; or (d) who are Hobby Lobby agents or employees, or are family members of

Hobby Lobby agents or employees, or who are otherwise affiliated with Hobby Lobby.

Doc. 151-1, pp. 14-15, ¶ 6.

### 2.    **Compensation to the Class**.

While the mechanics and underlying factual predicates for the two classes do not differ, the compensation to the Class Members differs between the cases because of a difference in the damages awardable to successful claims under the Alabama and Florida Deceptive Trade Practices Acts.  The ADTPA provides that successful claimants under its statutory private right of action are entitled to, "Any actual damages sustained by such consumer or person, or the sum of $100, whichever is greater." Ala. Code § 8-19-10(b).  For this case, the damages for successful claimants would be, $100.00.  None of the sales in the documents produced by Defendant showed damages of more than $100.00.

The damages provision in the FDUTPA states that an individual consumer may recover "actual damages." Fla. Stat. Ann. § 501.211.  This means that in nearly every case, a successful Florida claim would produce a smaller award than a successful Alabama case.  For Instance, Mr. Browning purchased a chest of drawers that had a green tag price of $289.99, and an orange tag price of $202.99.  The difference in 40% off of the higher price vs. 40% off of the lower price is $52.19.  That is her actual damage amount.  However, under the ADTPA, she would be

entitled to $100.00 if successful, because it is greater than her "actual damages." Ala. Code § 8-19-10(b).  Mr. Marcrum, on the other hand, purchased a small table with a green tag price of $119.99, and an orange tag price of $83.99.  The difference in applying the 40% off coupon to the two prices is $21.60.  Under the FDUTPA, Mr. Marcrum would be able to recover $21.60.  Had the same transaction taken place in Alabama, the successful Marcrum claim would result in a $100.00 award.

### a.    The Relief to the Alabama Class.

Each Alabama Class member who submits a proper claim will receive monetary compensation of $14.00.  Additionally, each qualifying Alabama Class member will receive a Hobby Lobby gift card, which can be used to purchase any item at Hobby Lobby, in the amount of $25.00, for a total class benefit of $39.00.

### b.    The Relief to the Florida Class.

Each Florida Class member who submits a proper claim will receive a check for $14.00.

Each proper Alabama claimant will receive 39% of the total awardable on a successful claim.  An analysis of the data produced for qualifying transactions in Florida reveals that the average after tax damages amount for Florida furniture purchases is $25.92.  The $14.00 payment represents 54% of the total damages awardable for the average Florida claimant.

3.    **Releases.**

In exchange for the above benefits, Settlement Class Members will provide to Defendant general releases of any and all known or unknown claims arising out of or relating to the Hobby Lobby's business practices with regard to the use of its 40% off coupon.  Docs. 150-1, pp. 25025, ¶ 14; 151-1, pp. 25-26, ¶ 14.

4.    **Notice and Administration.**

The Settlement provides for appropriate notice to the Class Members.  The parties have selected an Administrator, JND Legal Administration, to administer the notice and the claims process.  Doc. 150-2, p. 30, ¶ 9.01(f).  Defendant is to pay all costs and expenses related to notice and administration.  Id.  The Notice program will consist of the following:

    a.    Two forms of class action notice have been developed.  A long form Notice of Pendency of Class Action, Proposed Settlement and Hearing ("Long Form"), and a Summary ("Short Form") notice.  The Long Form Notice sets forth in some:  detail the history of the litigation and the settlement, while the Short Form Notice sets forth the basic parameters of the settlement, and directs readers to the Long Form Notice available on the Class Settlement website.  The notice are to be distributed as follows:

    b.    The Long Form Notice will be published on the Settlement Administrator's website.

    c.    The Short Form Notice will be published in newspapers in Birmingham, Huntsville, Montgomery, and Mobile, Alabama; and in Pensacola, Tallahassee, Jacksonville, Orlando, Tampa, and Miami, Florida.

     d.     The Short Form Notice will be posted on Hobby Lobby's website for ninety (90) days in advance of the Final Settlement Fairness Hearing.

     e.     Hobby Lobby will post in Florida and Alabama stores a notice substantially similar to the Short Form Notice, within thirty (30) days of the entry of an Order preliminarily approving the settlement, and which will remain posted in Hobby Lobby's stores for a period of time at least thirty (30) days in advance of the Settlement Fairness Hearing.

Doc. 150-1, 150-1, pp. 19-21,  ¶¶ 9.01(b)-(c), 9.02, 9.03.

## 5.    __Attorney's Fees and Expenses__.

Defendants have agreed that they will pay, in addition to other consideration outlined herein to the Settlement Class Members, attorney's fees and expenses; and will not oppose or object to Class Counsel's application for all attorney's fees, costs and expenses in an amount up $425,000.00, for both cases in the aggregate, subject to Court approval.  Doc. 150-1, 151-1, pp. 31-37, ¶ 25.[5]  The agreement with respect to attorney's fees, costs and expenses was negotiated after the substantive terms of the settlement, including the Prospective Remedial/Injunctive Relief to the

---

[5]  The total attorney's fees and for both cases is $425,000.00.  This is based on the total work in both cases, a great deal of which was overlapping, and used for both cases. Because there are, in actuality, two separate settlements, and because the Alabama case was first developed, and this took slightly more work, and required some extra legal briefing on the issue of whether <u>Lisk</u>, <u>supra</u>, applies to the case, $225,000.00 has been allocated as attorneys' fees and expenses for the <u>Phillips</u> case, and $200,000.00 allocated for the <u>Marcrum</u> case.

Settlement Class, had been negotiated and agreed upon during the mediation.  Doc. 152-7, pp. 7-8, ¶¶ 18-21.

## II.  ARGUMENT

"A Class may be certified 'solely for the purposes of settlement where a settlement is reached before a litigated determination of the Class certification issue.'"  Liploma v. Am. Express Co., 406 F.Supp.2d 1298, 1313-14 (S.D. Fla. 2005).  In this case, all elements for Class certification under Fed.R.Civ.P. 23(a)(1)-(4) and (b)(3) have been met.

### A.    The Requirements of Fed.R.Civ.P. 23(a) Are Met.

The Fed.R.Civ.P. 23a requirements are: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy.  Those requirements have been met.

#### 1.    The Class Is Sufficiently Numerous.

Rule 23(a)(1) only requires that the class be so numerous that joinder of all members is "impracticable."  Kleiner v. First National Bank of Atlanta, 97 F.R.D. 683 (D.C. Ga. 1983).

In this case, pursuant to a discovery protocol, Doc. 152-10.  Hobby Lobby produced four days of data from approximately 700 of its retail stores.  Doc. 152-10.  The Alabama Class period is between May 19, 2015, and October 2, 2017.  This is a period of 867 days.  Hobby Lobby is closed on Sundays, Christmas Day, New

Year's Day, and Thanksgiving Day, meaning it is closed 15% of the time. This means Hobby Lobby was open 737 days during the Alabama Class period. Four days out of 737 is approximately 1/184th of the Class period, or 5%. The same calculation for the Florida Class yields 1,037 business days during the Class period. The four day data slice is 1/258th of the Class period, or 3%.

Attached hereto as Ex. A is a spreadsheet wherein, using the process outlined infra at p.p. 26-31, one hundred fifty-nine (159), Alabama Class members have been identified during the Class period; and one hundred and seventy-eight (178) Florida Class members have been identified. These numbers alone would meet the numerosity threshold where the law is that, "generally less than twenty-one is inadequate, more than forty adequate, with numbers between varying according to other factors." Cox v. American Cast Iron Pipe Co., 784 F.2d 1546, 1553 (11th Cir. 1986); See, Zeidman v. J. Ray McDermott Co., 681 F.2d 1546, 1553 (8th Cir. 1981) ("classes with as few as twenty-four or thirty members have been certified by some courts.").

The raw numbers from the data slice would be sufficient to meet the numerosity threshold. However, a simple extrapolation reveals the numbers are far greater. If the Alabama Class is extrapolated out to account for the 1/184th slice of data, the total Class membership becomes 29,256. The Florida 1/288th of data

becomes 45,924 class members.  The information in the databases, plus the simple extrapolation, more than meets the standard to show that "joinder is impracticable through 'some evidence or reasonable estimate of the number of purported class members.'"  Anderson v. Bank of the South, 118 F.R.D. 136, 145 (M.D. Fla. 1987).

## 2.    **Commonality**.

The Rule 23(a)(2) commonality requirement is "not high."   Morris v. Transouth Fin. Corp., 175 F.R.D. 694, 697 (M.D. Ala. 1997), and the standard is qualitative rather than quantitative.  Moreover, one common question may be sufficient to satisfy Rule 23(a)(2).  Larry James Oldsmobile-Pontiac-GMC Truck Co. v. General Motors Corp., 164 F.R.D. 428 (N.D. Miss. 1996); 1 Newberg on Class Actions 3d (1992) § 3.10.  As one court explained:

> A common question is one which arises from a "common nucleus of operative facts" regardless of whether "the underlying facts fluctuate over the class period and vary as to individual claimants."  Cohen v. Uniroyal, Inc., 77 F.R.D. 685, 690-91 (E.D. Pa. 1977); In re Corrugated Container Antitrust Litigation, 80 F.R.D. 244, 250 (S.D. Tax. 1978).  See also, Muth v. Dechert, Price & Rhoads, 70 F.R.D. 602, 607 (E.D. Pa. 1976) (common course of conduct yields common questions).

In re Asbestos School Litigation, 104 F.R.D. 422 (E.D. Pa. 1984), aff'd in relevant part and rev'd in part sub nom, 789 F.2d 996 (3d Cir. 1984), cert. denied, 479 U.S. 852 (1986).

The overriding and dispositive question in this case is whether the application of the 40% discount provided for on the Hobby Lobby coupon for an item at "regular price" to the green tag price, as opposed to the orange tag price, is deceptive. That question is common for every purchaser of furniture in the class.

The operative question is the interpretation of common language in a commercial transaction between the parties. The question is akin to the interpretation of a form contract. The law as to such cases is that claims arising from interpretations of a form contract appear to present the classic case for treatment as a class action, and breach of contract cases are routinely certified as such. Kleiner v. First Nat'l Bank, 97 F.R.D. 683, 693 (N.D. Ga. 1983).

Additionally, claims under the ADTPA and FDUTPA are particularly suited for class certification because the question under those statutory enactments is not whether any particular class member would find the practice deceptive, but rather whether it would be deceptive to an objective, reasonable, consumer. Fitzpatrick v. General Mills, Inc., 635 F/2d 1279, 1283 (11th Cir. 2011).

3.    **Typicality.**

Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class."  There must be some nexus between the class representative's claims and the common questions of law or facts which unite the class.  Kornberg v. Carnival Cruise Lines, Inc., 741 F.2d 1332 (11th Cir. 1984).  A sufficient nexus is established if the claims of the class and the claims of the class representative arise from the same event or pattern and are based on the same legal theory.  Id. at 1337.  Typicality, much like the element of commonality, is established if the representative plaintiff's claims arise from the same practice or course of conduct and are based on the same legal theory as those of other class members.  Warehouse Home Furnishing Dist., Inc. v. Whitson, 709 So.2d 1144, 1149 (Ala. 1997).

As one commentator concluded:

> When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met **irrespective of varying fact patterns which underlie individual claims.**

Newberg on Class Actions 3rd § 3.13, pp. 3-77 (emphasis added).

Typicality analysis is very similar to commonality analysis. "Commonality and typicality tend to merge with the adequacy not in representation factor because all examine 'whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" Fisher v. Ciba Specialty Chem. Corp., 238 F.R.D. 273, 297 (S.D. Sala. July 13, 2006), quoting Gen. Tel. Co. of the Southwest v. Falcon, 457 U.S. 147, 157 (1982). In this case, there is no difference between the factual or legal predicates underlying the named representatives' claims, and the remainder of the Class. There was a common coupon applied to merchandise subject to uniform pricing practice. The legal theory advanced does not rely upon whether Mr. Browning or Mr. Marcrum were deceived; it relies upon whether an objective consumer would be deceived. There is no difference in the claims of Mr. Browning and Mr. Marcrum and the rest of the Class. They are common and typical.

### 4.    <u>Adequacy of Representation.</u>

Rule 23(a)(4) requires that the named Plaintiff fairly and adequately protect the interests of the members of the class. Adequate representation presents two questions: (1) whether Class Counsel are qualified, experienced and generally able to conduct the proposed litigation; and (2) whether the named plaintiff has interests that are antagonistic to the class. Griffin v. Carlin, 755 F.2d 1516, 1533 (11th Cir.

1985).  <u>See</u> <u>also</u>, <u>In re Asbestos School Litigation</u>, 104 F.R.D. at 430; <u>Pettco</u>
<u>Enterprises, Inc. v. White</u>, 162 F.R.D. 151 (M.D. Ala. 1995).

The question as to adequacy of counsel has been answered in the zealousness
with which Class Counsel has pursued this case.  Doc, 152-7, p. 3-6, . ¶¶ 3-15.  Over
the course of these cases, counsel have drafted numerous pleadings; briefed and
researched key issues for the Court; consideration; requested, reviewed and analyzed
significant discovery; led Plaintiffs' litigation effort, including the filing of
numerous briefs; retained and consulted with consumer and data experts; briefed key
issues; and negotiated a settlement in contested negotiations.  Doc. 152-7, p. 3-6, ¶¶
3-15.

Both Class representatives have performed the duties necessary to represent
the Class.  Mr. Marcrum has met with counsel about the case in person an estimated
five (5) times, he talked with counsel on the phone "at least once a month", and has
reviewed documents related to the action.  Marcrum depo, Ex. B hereto, p. 52. Mr.
Marcrum has stated that he understands that he is "responsible for representing
everyone else that also had the same occurrence happen to them that happened to
myself," and would plan to be at the trial even if the trial took several weeks.
Marcrum depo, pp. 53-54.  Similarly, Mr. Browning is an active participant in the
case.  In response to a question as to what is his role in the case, he stated, "Anything

that needs – that I need – am required to do, I'll do for this lawsuit."  Browning depo., Ex. C. hereto, p. 91.  Mr. Browning also stated that he would attend a trial of the case, even if it talks several weeks to try.  Browning depo., p. 93.

### B.    Rule 23(b)(3) Requirements are Met.

Rule 23(b)(3) requires that common questions "predominate" over individual ones, and that the class action be superior "for the fair and efficient adjudication of the controversy."  Rule 23(b)(3) requires that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, must predominate over those issues that are subject only to individualized proof.  Jackson v. Motel 6 Multipurpose, Inc., 130 F.3d 999, 1005 (11th Cir. 1997).  "In order to 'predominate,' common issues must constitute a significant part of the individual cases." Jenkins v. Raymark Industries, Inc., 782 F.2d 468, 472 (5th Cir. 1986). Moreover,

> A single common issue may be the overriding one in the litigation, despite the fact that the suit also entails numerous remaining individual questions . . . . In finding that common questions predominate over individual ones in particular cases, courts have pointed to such issues that possess the common nucleus of fact for all related questions, have spoken of a common issue as the central, or overriding question, or have used similar articulations.

1 Newberg on Class Actions 3d (1992) § 4.25 at 4-85 to 4-86 (internal citations omitted).  The central and predominant issue in this case is whether applying the 40% off coupon to the green tag price is deceptive.  The facts to be tried concerning that issue are entirely the same for every person in the Class, and the resolution of that issue drive the case.

"Rule 23(b)(3)'s superiority requirement compares the class action device "to other available methods for fair and efficient adjudication of the controversy." Newberg on Class Actions, § 4.27, p. 4-108.  This is particularly important in this action because of the small amount of most individual claims.  The Supreme Court in Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 809, recognized that without a class action, many small claims would never be adjudicated.

> Class actions also may permit the plaintiffs to pool claims which would be uneconomical to litigate individually... This lawsuit involves claims averaging about $100 per plaintiff; most of the plaintiffs would have no realistic day in court if a class action were not available.

Id.

> The aggregation of individual claims in the context of a classwide suit is an evolutionary response to the existence of injuries unremedied by the regulatory action of government.  Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages,

>aggrieved persons may be without any effective redress
>unless they may employ the class-action device.

Deposit Guaranty Nat'l Bank v. Roper, 445 U.S. 326, 339 (1980).  While a lengthy

and complex trial would have been manageable in this case, all can agree that the

settlement of such an action is to be desired and encouraged.[6]

**C.    The Settlement of this Case Is Fair, Reasonable, and Adequate.**

**1.    The Form of the Notice in this Case is Reasonable.**

Notice in a class action case must provide class members with "information

reasonably necessary to make a decision [whether] to remain a class member, and

be bound by the judgment, or opt out of the action.  The notice, however, need not

include every material fact or be overly detailed."  Fought v. American Home Shield

Corp., 2011 U.S. App. Lexis 22073 (11th Cir. Oct. 31, 2011), quoting In re Nissan

Motor Corp Antitrust Litig., 552 F.2d 1088, 1104-05 (5th Cir. 1997).

The notice in these cases consists of a short form "Summary Notice", and a

long form notice.  The short form describes in detail who is in the class, and what

the benefit to the class is.  It also tells readers that they have the option to exclude

themselves from the class or object to the class settlement, and provides dates for

---

[6] To state the obvious, "Settlements benefit everyone in the process and everything that can be done to encourage such settlements – especially in complex class action cases – should be done." Lipuma v. Am. Express Co., 406 F.Supp.2d 1298, 1324 (S.D. Fla. 2005), quoting In re M.D.C. Holdings Sec. Litigation, 1990 U.S. Dist. Lexis 15488 (S.D. Cal. 1990).

doing so.  Perhaps most importantly, the short form notice provides a link to the long form notice, which provides greater details of the settlement, and lays out how a claim can be made.  The long form also provides a telephone number that class members can call with questions about the settlement.

The long form notice provides a general description of the lawsuit, who is included in the case, and the options for opting out or objecting to the settlement.  All of this is stated in plain English on the settlement website.  On the website is a FAQ tab, answering common questions about the settlement, as well as an electronic claim form.  All of this is in manageable, readable form that more than meets the standard of providing information reasonably necessary to make a decision as to whether to remain a class member, opt-out, or object.

### 2.    The Dissemination of Notice in this Case was Reasonable.

The Notice Plan relies upon publication and posting notice because Hobby Lobby does not retain and records that would show contact information for purchases of furniture at Hobby Lobby.

Not only is the short form Notice being published in regular newspapers in Florida and Alabama, which is a standard publication protocol, but the short form notice has been posted on Hobby Lobby's website, with a link to all other relevant

documents as well as on signage in its stores. Under the circumstances, this is the best practicable notice.

A process to find the names and addresses of the purchasers of furniture from Hobby Lobby would be extremely costly and time consuming, and in the end, would only yield the names and addresses of some Hobby Lobby customers purchasing furniture that were accurate as of the time of purchase (with some purchases now dating back to seven years ago).

Rule 23(c)(2)(B) requires (for a class action under Rule 23(b)(3) like this one) the "best practicable notice under the circumstances, including individual notice to all members who can be identified through reasonable effort." Here, a large portion of the class could not be identified at all, and the process to identify the remainder of the class is laborious, time-consuming, and expensive. "When reasonable effort would not suffice to identify the class members, notice by publication, imperfect though it is, may be substituted." <u>Hughes v. Kore of Indiana Enterprises, Inc.</u>, 2013 WL 4805600 at * 4 (7th Cir. Sept. 10, 2013); citing <u>Juris v. Inamed Corp.</u>, 685 F.3d 1294, 1321 (11th Cir. 2012); <u>Manual for Complex Litigation</u>, § 21.311, pp. 287-88 (4th ed. 2004).

For those customers who paid via cash, check, gift card, VISA Debit card, or exchange, there is insufficient data to readily identify the customers at all. Lindsay

Gill Report, Doc. 152-8, p. 5.  For the remainder of the class, there is an arduous, multi-step laborious, time-consuming, and expensive process; and such a search process would only identify customers at addresses that are now several years old.

Hobby Lobby operates approximately 738 retail locations throughout the United States.  Hale depo., Excerpts attached hereto as Doc. 152-9, p. 3.  Hobby Lobby keeps transactional data for purchases made at these location on an electronic journal on a database called ASEJ.  Doc. 152-9, pp. 4-6.

The records for each transaction exist, on Hobby Lobby's system, in fields contained in a sortable, searchable database.  Doc. 152-9, p. 4.  The fields may be searched to identify transactions where furniture was purchased and a 40% off coupon was used.  Doc. 152-9, pp. 10-13.  But a search of these fields cannot yield the names and addresses of customers.  The only information that is in Hobby Lobby's  system is the first six digits of a credit or debit card number, and the last four digits.  Doc. 152-9, p. 11.  There is no data to identify cash or check customers.

The information necessary to ascertain any particular transaction's associated sixteen-digit credit card number is available only from Hobby Lobby's third-party credit card processor, Vativ, Inc., which is now Worldpay, LLC ("Worldpay").  Obtaining the sixteen-digit credit card numbers is a laborious process, and then attaching a name to those numbers is yet another laborious process.  The first step is

to obtain the raw data for all Hobby Lobby transactions at all of its retail locations for the class periods.  As might be expected, this is a massive amount of electronic data.  In order to manage the data, the parties agreed to a protocol, Doc. 152-10.  First, data from just three stores from three separate states was produced in order to determine whether the raw data from the ASEJ system could even be formatted such that the fields could be sorted and ultimately read and analyzed.  In order to do this, the raw ASEJ data had to be sent to an outside consulting firm, Boston Retail Partners ("BRP"), who:  (1) determined if the data could be accurately re-formatted; and then; (2) re-formatted the data.  Doc. 152-7.. p. 6, ¶ 10.  BRP did determine that the data could be successfully reformatted, so the parties could then proceed with a thin slice of data for class certification purposes.  The cost for this work on the limited data set was $18,705.00.  Clark Supplemental Declaration, Ex. D hereto, ¶¶ 1-2.

The next step called for Hobby Lobby to produce just four days of data from each of its 700 plus stores to determine if a viable method for identification of individual Class Members could be achieved.  Doc. 157-10.  That four-day sample amounts to $1/258^{th}$ of the Florida Class, and $1/184^{th}$ of the Alabama Class, so the process outlined below is a mere fraction of the work that would need to be done to identify names and addresses of the entire class for the entire class period.

BRP was provided ASCII text files from Hobby Lobby. This was unformatted text that had to be formatted into a readable, sortable database. Doc. 152-11, p. 4, ¶ 4, ¶¶ 2-4. In order to do this, BRP developed a computer script program designed to scan the ASCII files and convert the text into *.CN format that could be imported into an Excel spreadsheet. Doc. 152-11, p. 4, ¶ 4. Those Excel files were than transmitted to Plaintiffs' counsel. BRP was paid $18, 705.00 just for this work which, once again, analyzed 1/258[th] of the Florida Class and 1/184[th] of the Alabama Class.

The next step was that the Excel spreadsheets had to be searched for those transactions where furniture was purchased, and a 40% off coupon was used. Once that was accomplished, those transactions were sent via spreadsheet to Vantiv/Worldpay ("Worldpay"), to match the transactions with sixteen-digit credit card numbers. Doc. 152-7, pp. 5-6, ¶¶ 11, 17. After months of communication, Worldpay determined that it was able to do this, and sent back to Plaintiffs' counsel all reasonably available sixteen-digit credit numbers. The one large gap was VISA debit card purchases, a not insignificant swath of Class Members, which Worldpay no longer had available because by the time the request was made, the data had rotated off of the Worldpay system. Patterson Declaration, Doc. 152-12. It is

unknown what Worldpay would have charged the parties if it had to use its resources to identify the data for all Class Members for the entire class period.

The final step in identifying the individuals was then to match those sixteen-digit credit card number with actual individuals. This was done by running a query on the database against something called a BIN code. Doc. 152-13, p. 3. A BIN code is essentially the anatomy of a sixteen-digit credit card number. A bank identification number ("BIN"), is the initial four to six numbers that appear on a credit card. Doc. 152-8, p. 6, n. 3, citing https://www.investopedia.com/ terms/b/bank-identification-number.asp. The BIN data is publicly available for a fee, id., and was accessed in this case from www.bincodes.com in an XML format, which was then queried against the database of qualifying transactions, resulting in identification of each credit or debit card used in each particular transaction. Doc. 152-8.

The final step in identification was to send subpoenas to the banks identified for the transactions, requesting the name and address for the cardholder. Doc. 152-7, p. 6, ¶ 12. A separate subpoena did not need to be sent out for each transaction, because many customers use the same banks, however, in just the small data slice necessary for certification, hundreds of different banks had to be subpoenaed. A copy of one of those subpoenas, and the response received, as an example of the

process are attached hereto.  Docs. 152-14; 152-15.  Lindsay Gill of Forensic Strategic Solutions, LLC, performed the final database work, i.e., the work of matching BIN codes to transactions, and the work of creating spreadsheets showing the transactions, the damages computed as the difference between application of 40% off of the green tag price as opposed to the orange tag price, and the identification of the cardholders, where applicable, for each transaction.

Ms. Gill identified 2,519 records of furniture purchases in the small slice of data provided where a 40% off coupon was used, where at least one debit or credit card was used for payment. Doc. 152-8, p. 6.  Out of those 2,519 records, 1029 of the purchases were with a Visa debit card, which Worldpay no longer had information for.  Of the remaining 1,491 records, the proper BIN codes were provided for all.  As of the time of her report, Ms. Gill had, through the subpoena process outlined above, been able to identify only 447 of the individuals.  Doc. 152-8, p. 6.

The above-referenced work, as stated above, does not include cash, check, VISA debit, or gift card customers, all of whom would be Class Members.  Ms. Gill's firm billed $23,200.55 for services in identifying the customers for just the four days of data in the test tranche of data. Clark Supplemental Declaration, Ex. D, ¶ 3.  Obviously, the time and expense needed to extrapolate the process to the entire

population of transactions (as opposed to $1/258^{th}$ or $1/184^{th}$) would grow exponentially, and as that process played out over time, there would be more movement of Class Members, meaning that fewer addresses would be current. While accurate identification of a portion of the class is certainly possible, it is extremely labor-intensive and costly, which means individual notice simply is not the best practicable notice for this class.

Publication notice is the more practicable in this case. Notice in this case was published on the Hobby Lobby website. This is in addition to the traditional form of notice publication. Notice was also posted on signage in the Hobby Lobby stores. This publication is much more targeted, particularly because Hobby Lobby customers tend to be repeat customers.

Notice by publication in consumer class action cases "is not unique on form." In re Domestic Air Transp. Antitrust Litigation, 141 F.R.D. 534, 550 (N.D. Ga. 1992). "Notice by publication, including posting, has been approved in several consumer class actions." Id. Moreover, there is no question that publication notice is sufficient as to those persons who cannot be identified and therefore individually noticed. Mullane v. Central Hanover, 339 U.S. 306, 317 (1950); In re Nissan Motor Corp. Antirust Litig., 552 F.2d 1088, 1097 (5th Cir. 1997). Manual for Complex Litigation, § 21.311 (4th ed. 2004) ("Publication in magazines, newspapers, or trade

journals may be necessary if class members are not identifiable after reasonable effort."). More recently, the 11th Circuit reaffirmed publication notice as proper in a consumer class action case where members of the class were not identifiable. Poertnor v. Gillette, 618 Fed. Appx. 624 (11th Cir. 2015). In this case a large swath of the class is similarly unidentifiable, and the efforts necessary to identify the remainder are costly and cumbersome. In such cases, publication and posting notice is proper as the best practicable notice.

The notices described above provide all pertinent information and fully inform the Class Members of this litigation, the Settlement and what actions they may take. The Short Form Notice explains the benefits of the Settlement, how to obtain a payment under the Settlement, the potential Class Member's other rights (i.e., the right to opt-out, the right to object, the release of claims against Defendant, and their right to hire an attorney) and how to obtain additional information and a claim form.

The notices are clear and straightforward, providing putative Class Members with enough information to evaluate the settlement and object to or opt-out the settlement if desired. This comprehensive plan is adequate under Rule 23(c)(2). See, e.g., Smith v. Wm. Wrigley, 2010 WL 2401149, at *6 ("Because Wrigley does not sell the Product directly to consumers, and thus there is no way to identify the

vast majority of individual Class members, Wrigley dos not have mailing addresses for Class members.  Based upon Wrigley's media plans for the products, Garden City was able to design a notice program that maximized exposure to Class members."). The Class Notice was provided in newspapers of general circulation in major markets of Alabama and Florida, as well as on the Hobby Lobby website, and in its stores.  The foregoing satisfies the requirements of Rule 23(e)(1).

### D.    **The Settlement is a Fair and Reasonable Compromise.**

The settlement is a fair and reasonable compromise of a disputed claim.  Both Florida and Alabama claimants will receive $14.00 in cash.  In addition to the $14.00 cash payment, Alabama claimants will receive a $25.00 gift card, which may be used at a Hobby Lobby store.  It is important to note that the gift card is fully transferrable, and does not require any purchase at Hobby Lobby above and beyond the use of the gift card.  In other words, a Class member or transferee may use the gift card like cash at a Hobby Lobby store.  A Class member who purchases items for $25.00 or less will not come "out of pocket" any money.  Of course, if a Class member chooses a more expensive item, the $25.00 gift card will be applied to the balance.

As stated above, the reason for the difference in the relief between the two Classes arises out of the difference in the damages awardable under the ADTPA and the FDUTPA.  Attached hereto as Ex. A is a spreadsheet of the furniture purchases

from Hobby Lobby stores wherein a 40% off coupon was used for the four day data slice produced in the case. This spreadsheet computes the damages for each transaction (Column W), being the difference between application of the 40% off coupon to the green tag price vs. application of the coupon to the orange tag price. The average damages, per claimant, are $25.92.

## 1.  <u>The Alabama Damages.</u>

Not a single transaction in the above-referenced database produced a damages figure above $100.00. The highest damage figure for any transaction is $81.27. This is important because the ADTPA states that the damages available are, "Any actual damages sustained by such consumer or person, or the sum of $100, whichever is greater. Ala. Code § 8-19-10(b). This means that every member of the class would be entitled to $100.00 on a successfully litigated class.

The Alabama claimants will receive total compensation of $39.00 ($14.00 in cash, plus the $25.00 gift card). The gift card is a cash equivalent at Hobby Lobby stores. It is not like a coupon, commonly defined as "a discount on another product or service offered by the defendant in the lawsuit. <u>Fleury vs. Richemont North American, Inc.</u>, 2008 WL 3287154 at * 2 (N.D. Cal. Aug. 6, 2008). The gift card does not reduce the amount a claimant must pay to purchase a Hobby Lobby item, it is cash at Hobby Lobby, and the claimant will pay Hobby Lobby a dime for items

purchased for under $25.00. The relief afforded each claimant in Alabama is 39% of the maximum award allowable.

### 2.    The Florida Damages.

The FDUOA's damages provision allows for a reward of "actual damages" for each successful plaintiff. Fla. Stat. Ann. § 501.211. In this case, the average amount is $25.92. There is no provision providing any other damages amount. The $14.00 relief is 54% of the total value of an average fully successful Florida action.

### 3.    The Relief Meets the Standard for Fairness And Reasonableness.

The Settlement Agreement falls within the range of possible recovery. Given the difficulties Plaintiffs would have to overcome if they were to litigate these cases to verdict, the recovery under the terms of the Settlement is fair, adequate, and reasonable. While Plaintiffs and their counsel believe the claims are meritorious, Defendant has raised, and would continue to raise, challenges to class certification and to the legal and factual basis for Plaintiffs' claims.

Throughout the litigation, and even now, Defendant vigorously denies that it engaged in any misrepresentations or wrongful conduct in its 40% off coupon program, and deny that the cases can be litigated as class actions under F.R.C.P. 23. Thus, there is no guarantee of Plaintiffs' success at trial, or even that the case would be certified as a litigated class action. The Settlement Agreement proposed by the

parties immediately provides the certainty of valuable and substantial benefits to the Class Members in cash and (for Alabama Class Members) "dollar for dollar" gift cards. Indeed the amount of the class benefit is a substantial percentage of what any Class Member could expect to receive in successful litigation. Courts have held that class recoveries between 13% and 20% are "frequently found . . . to be fair and adequate." <u>Pardons v. Brighthouse Networks, LLC</u>, 2015 WL 13629647 at *3 (N/.D. Ala. Feb. 15, 2015). These two cases are significantly above those ranges.

If the case were not settled, it would be necessary to continue prosecuting the litigation against Defendant through class certification and trial. Even if Plaintiffs were successful at obtaining class certification and/or judgment at trial, appeals are likely, thereby delaying by years any potential benefits to the class that could come from this litigation. In sum, the proposed Settlement provides Settlement Class benefits which are in the upper range of possible recovery.

The complexity, expense and likely duration of litigation also weighs heavily in favor of settlement approval. This case is complex and has already required the use of experts by both sides to sort through a mere fraction of the voluminous data that would be necessary to be processed if the cases went to trial. Dec. 152-7, p. 5, ¶ 10. The litigation has been pending for over five years and, if it continued through trial, would involve extensive additional discovery spanning hundreds of thousands

of documents, voluminous and additional electronic data, and additional depositions of fact witnesses and experts.  Doc. 152-7, p. 6 ¶ 15.  The size of this case and the complexity of the issues would result in the additional expenditure of significant amounts of time and money.

The next fairness element, the "stage of the proceedings," also weighs in favor of Settlement approval.  More than four years have elapsed since the filing of the initial Complaint in this matter.  As outlined above, numerous motions have been filed.  Extensive written discovery has occurred.  Hundreds of thousands of pages of documents have been produced and reviewed. Depositions have been taken including expert depositions. Accordingly, the parties are well aware of the respective strengths and weaknesses of their cases.

The judgment of experienced trial counsel also weighs in favor of approval. In considering a proposed settlement, the Court should give the judgment of experienced counsel significant weight.  Proposed Class Counsel has extensive experience in class action litigation.  Doc. 152-7, p. 3, ¶¶ 2-3.  Moreover, counsel for Defendant has vast experience in class action litigation, particularly consumer class action cases.  Based upon considerable experience in handling cases such as the present case, counsel for Plaintiffs and Defendants are well suited to determine the need and the value of settling litigation such as the present case.

The "nature of the negotiations" also weighs in favor of settlement approval. Plaintiffs and Defendant negotiated over the course of nine months. The negotiations were challenging and contentious. Doc. 152-7, pp. 6-9, ¶¶ 12, 17-19. Even now, Defendant denies any wrongdoing, but has agreed to settle in order to resolve the cases and avoid further burden and expenses. Plaintiffs and Defendant participated in multiple sessions with an experienced mediator, both face-to-face and over the phone before reaching a settlement. Doc. 152-6, pp. 4-7, ¶¶ 10-19. The negotiations were at arms-length and were not a product of collusion. Id.

The "substance and amount of opposition to the settlement," as this point cannot fully be calculated, but to date there have been no objections.

Plaintiffs, as in any civil action, face a risky road to recovery, and Hobby Lobby has vigorously denied every allegation in the Complaint and fought the case vigorously at every step. In this case, however, there is another entire additional layer of scrutiny to be overcome in order to achieve class recovery – class certification. If the plaintiffs were to fail at the class certification this case would be effectively over as a class action. That is the hurdle to be jumped even before the substance of the case is taken up.

Even if certification were achieved, the case would be vehemently opposed at trial, in addition to the appellate process. Defendant's able counsel has retained

nationally renowned experts to contest both certification and the merits of the case. No doubt, this witness would testify that individual issues abound, and that a consumer would not be deceived by Hobby Lobby's use of the coupon in this case. There are simply no guarantees of success at class certification or trial.

### E.    A Fee and Expense Award of $425,000.00, is Fair And Reasonable in This Case.

There are two justifications for a fee in class action cases: a percentage of the common fund approach, adopted for the 11th Circuit in <u>Camden I Condo. Assoc. v. Dunkle</u>, 946 F.2d 768, 774 (11th Cir. 1991); and because both the ADTPA and the FUDTPA provide for attorneys' fees for successful litigants, an hourly rate, or lodestar calculation, "based upon the product of reasonable hours spent on the case and a reasonable hourly rate." <u>Northwester Eng'rs Fed. Credit Union v. Home Depot, Inc.</u>, 931 F.3d 1063, 1076 (11th Cir. 2019) ("Courts calculate attorney's fees using two methods: the percentage method or the lodestar method.") Under either method, Plaintiffs' request for expense reimbursement, an incentive award for the Class representatives and attorney's fees in the amount of $425,000.00 is reasonable.

### 1.    The Fee Requested.

After all material aspects of the relief for the Class were agreed upon with the above assistance of mediator James Pratt, the parties, through a series of phone conversations and written proposals, Doc. 152-7, ¶¶ 18-22 , were able to come to an

agreement to settle all aspects of the case, including reimbursement of expenses, and a reasonable attorneys' fee.  The agreement reached was that Hobby Lobby would pay Plaintiffs' counsel $425,000.00 for expense reimbursement, attorneys' fees, and for a class representative fee, is allowed by the Court.  The expenses in this case are, to date, $101,538.21, Ex. D., ¶ 4, leaving $323,461.79 for an attorneys' fee and class representation award, if allowed.

### 2.    The Fee is Reasonable as a Percentage of The Common Fund Created.

In <u>Camden I</u>, <u>supra</u>, the Eleventh Circuit announced the rule that, "Henceforth, in this circuit, attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class." <u>Carpenters Health & Welfare Fund v. Coca Cola Co.</u>, 587 F.Supp.2d 1266, 1268 (N.D. Ga. 2008), citing <u>Camden I</u>.

### a.    The Funds Created.

Funds have been established for the payment of settlement claims in both cases.  Those funds are substantial.  For the Marcrum (Florida) case, the data slice produced shows 178 class members over four days, or approximately $1/258^{th}$ of the class period.  A simple extrapolation shows a fund created for the payment of 45,924 claims in Florida.  At the agreed upon $14.00 per claim, the total fund created is $642,936.00.  In Alabama, the $1/184^{th}$ data slice of the class period shows 159 class

members.  A simple extrapolation shows a total of 28,256 class members.  At the agreed upon $39.00 per claim, the total fund created is $1,140,984.00.  The total aggregate settlement funds created for the classes is $1,783,920.

### 3.    The Common Fund Includes the Expenses and the Costs of Administration.

The benefit to the class, or common fund, in this case includes the expenses of litigation, and the costs of administrating the settlement.  The benefits conferred by the two funds are not just magically transferred to the class members.  In addition to the attorneys' fees discussed *infra*, the common fund includes the litigation expenses of $101,538.31 expended by Class Counsel, Ex. D, ¶ 4.  The law is that, "Whether the cash portion of the settlement is used to pay attorneys or to distribute certificates to class members, the expenditures of the fund inure to the benefit of the class.  Accordingly, the Court rejects the argument that the calculation of the value of the common fund should exclude all cash used to pay attorneys' fees and the expenses of claims administration."  In re Domestic Air Transp. Antitrust Litigation, 148 F.R.D. 297, 354 (N.D. Ga. 1993); Bradburn Parent Teacher Store, Inc. v. 3M, 513 F.Supp.2d 322 (E.D. Pa.2007) ("Attorneys who create a common fund for the benefit of a class are entitled to reimbursement of reasonable litigation expenses from the fund" including settlement administration), quoting In re Aetna, Inc. Securities Litig., 2001 U.S. Dist. Lexis 68 (E.D. Pa. 2001); In re Southern Ohio

Correctional Facility, 175 F.R.D. 270, 274 (S.D. Ohio 1997) (included in common fund are reimbursable expenses including litigation and settlement administration expenses).

The benefit to the class from which attorneys' fees may be calculated includes the necessary expenses in creating that fund (litigation costs), and administrating that fund (settlement administration costs), the $425,000.00 agreed upon in this case.

### 4.    The Common Fund Includes Attorneys' Fees.

"As the Supreme Court acknowledged in Boeing Co. v. Van Gemert, 100 S. Ct. 745, 749 (1980), this court has recognized consistently that a litigant or lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorneys' fee from the fund as a whole." Barton v. Drummond, Co., 636 F.2d 978, 982 (5th Cir. 1981), quoting Boeing, supra. "The doctrine . . . rests on the principle that non-parties who reap substantial benefits from litigation without contributing to its costs should not be unjustly enriched." In re J.H. Inv. Svcs., Inc., 418 B.R. 413, 425 (M.D. Fla. 2009), Hillis v. Equifax Consumer Services, 2007 U.S. Dist. Lexis 48278 at *8 (N.D. Ga. June 12, 2007).

In this case, the common fund from which attorneys' fees are to be calculated includes the $1.78M in payments going directly to the class members, but also

expenses, the costs of settlement administration, and the attorneys' fee. If it did not, then the amount available to the class would be far less than the $1.78M to be distributed. If the common fund did not include attorneys' fees, litigation expenses, and settlement administration expenses, all of the amounts would have to be subtracted from the monies available to the class, reducing that amount. Instead, the fund available to the class was negotiated first, Doc. 152-7, p. 7, ¶ 18; Doc. 152-6, p. 5, ¶ 13, with the knowledge that the other expenses, including attorneys' fees, would be paid <u>in addition to</u> the funds available for distribution to the class. This manifest principle was specifically recognized, <u>supra</u>, in <u>In re Domestic Air Transp.</u>, when the Court "rejected" the argument that the common fund amount should, "exclude all cash used to pay attorneys' fees and the expenses of claims administration." <u>In re Domestic Air Transp.</u>, 148 F.R.D. at 354. The total fund, not even including attorneys' fees, is over $2.2M.

### 5.    <u>The Fee Requested Is Within the Camden I "Benchmark".</u>

The <u>Camden I</u> "reasonable percentage of the fund established for the benefit of the class." <u>Camden I</u>, 946 F.2d at 774. Is set at a 25% benchmark referred to above. <u>Id.</u> In this case, the total fund from which class benefits, litigation expenses, and settlement administration are to be paid is $2.2M, the fee portion requested is

approximately $324,000.00, which is 15% of the total fund.  This is within the

Camden I benchmark, and is properly awardable to Class Counsel in this action.

## 6.  The "Johnson" Factors Are Satisfied.

The Faught decision, supra, reiterated that the majority of fees in common

fund cases are reasonable where they fall between 20-25% of the fund.  Faught, 2011

U.S. App. Lexis 22073 (11th Cir. Oct. 31, 2011).  A further consideration is whether

the fee meets what are referred to as the "Johnson" factors first articulated in Johnson

v. Highway Express, 488 F.2d 714, 717-19 (5th Cir. 1974).  These factors are:

> (1) the time and labor required; (2) the difficulty of the
> issues; (3) the skill required; (4) the preclusion of other
> employment by the attorney because he accepted the case;
> (5) the customary fee in the community; (6) whether the
> fee is fixed or contingent; (7) time limitations imposed by
> the client or circumstances; (8) the amount involved and
> the results obtained; (9) the experience, reputation, and
> ability of the attorneys; (10) the undesirability of the case;
> (11) the nature and length of the professional relationship
> with the client; and (12) awards in similar cases.

Faught, supra at *21-22.

### a.  Time and Labor Required, and Preclusion of Other Employment (Factors 1, 4).

There is no question that the litigation of this case was time and labor

intensive.  Over 800 hours were expended in fighting through all obstacles presented

by able defense counsel.  There is simply no question that, even based upon a lodestar calculation, the time expended justifies the fee in this case.  There is similarly no question that Plaintiff's attorneys litigated this case at a high level to the exclusion of other work that could have been performed.

#### b.    <u>Difficulty of Issues and Skill Required (Factors 2, 3)</u>.

In this case, great skill was required to oppose well funded, diligent defense counsel in a class action concerning highly technical subject matter.  Class Counsel had to even navigate the issue of whether, pursuant to <u>Lisk v. Lumber One Wood Preserving, LLC</u>, 792 F.2d 1331 (11th Cir. 2015), this case could even proceed as a class action.  This is difficult work performed at a high level, and justifies a fee in keeping with <u>Camden I</u>.

#### c.    <u>The Fee Is Customary for Contingent Class Actions by Attorneys of the Reputation of Class Counsel (Factors 5, 6, 9, 12)</u>.

As stated throughout, a contingent common fund fee for a successful Plaintiff's class action is approximately 25%.  In this case, the fee is approximately 15%.  Even when lodestar is used as a "check", <u>infra</u>, the fee is proper.  Attached hereto as Ex. E is the Declaration of Tucker Brown, who has practiced in the area of

class actions for years. His opinion is that the fees for Mr. Clark are reasonable, and in line with what similarly situated counsel in the community command.

### d.    The Result Was Timely and Reasonable (Factors 7, 8).

As stated above, the result took five years to obtain, but it could have taken much longer. Having reached a fair settlement, class members can realize now, as opposed to years down the line and then only if successful, these benefits. The reasonableness analysis, supra, shows that given the uncertainties of litigation, the result is a real benefit to the class.

### e.    The Case Is a Small Recovery Case, Economically, Undesirable as an Individual Case (Factors 1, 4).

The total damages available for a successful individual claimant in this case, would be $100.00, for an Alabama plaintiff, and even less for a Florida plaintiff. An individual recovery would not support the time and expense of this case. As such, the fee requested is reasonable as a percentage of a common fund, which is lower than most individual continent fee agreements.

### 3.    If the Lodestar Method is Used, the Fee is More Than Justified.

Both the ADTPA and the FDUTPA contain fee shifting provisions for successful litigants. The Alabama Act states that in a successful action, a litigant

shall be awarded "the costs of the action or counter-claim, together with a reasonable attorney's fee."  Ala. Code § 8-19-10(a)(3).  The Florida Act provides that a prevailing party in an action under the FDUTPA "the sum of reasonable costs incurred in the action plus a reasonable legal fee for the hours spent on the case as sworn to in an affidavit."  Fla. Stat. Ann. §  501.2105.

In this case, attorney Brian Clark has expended over 770 hours on the case, and the Wiggins, Childs firm has expended over 850 hours on the cases.  Ex. D, ¶ 5. The bulk of that time was spent by attorney Brian M. Clark, at the rate of $550.00 per hour.  Mr. Clark has been practicing law in Alabama for thirty (30) years, and has handled many complex, document intensive cases; including class actions.  Mr. Clark has had class settlement approved in this District Court wherein his time was calculated at $600 per hour om 2015, Parsons v. Brighthouse, Civil Action No. 09-cv-0267-AKK; and $450.00 per hour, Barber Auto Sales, Inc. v. UPS, Civil Action No. 05-cv-04686-IPJ, in 2008.  Mr. Clark's rate of $550.00 per hour in this case is more than justified. Brown Decl., Ex. E.  Mr. Clark's portion of the Wiggins, Childs lodestar is 785 hours, to date, which computes to $431,750, is far in excess of the $323,441.69 requested in this case.

In addition Darrell Cartwright expended 126.2 hours in this case, at $425.00, per hour, for a total of $53,635.00.  Cartwright Decl., Ex. F hereto.

The fee requested is fair and reasonable under the lodestar method for calculating an attorney's fee in a fee shifting case. As such, it ought to be approved.

### E.    The Class Representative Awards.

After the class relief was agreed to in this case, the parties negotiated incentive awards of $3,000, for Mr. Browning, and $5,000, for Mr. Marcrum. Ex, D, ¶ 7.

It is important to note that these amounts were not negotiated until all material terms of the settlement were agreed to. Ex. D, ¶ 7. Such an award in no way detracts from or affects the settlement funds for the class members. Moreover, the agreement between the parties is that the payment of those funds comes out of the $425,000, in total agreed to for the parties for attorneys' fees and expenses.

No party objects to the payment of an incentive award, and the law, for generations, has been that, "Courts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of class action litigation." Ingram v. Coca-Cola Co., 200 F.R.D. 685, 694 (N.D. Ga. 2001). Both Browning and Marcrum more than lived up to their responsibilities in this case. Mr. Browning carried on the case as the personal representative of his wife's estate after she passed away during the course of this case. Mr. Marcrum traveled from Florida to meet with counsel and to be deposed in

this matter. Both representatives responded to written discovery request, provided documents, and sat for lengthy depositions.

Hobby Lobby does agree not to oppose this request, ultimately. Plaintiffs' counsel, however, are not unmindful of the Johnson v. NPAS Sols., LLC, 975 F.3d 1244 (11th Cir. 2020) case decided by the 11th Circuit in September of 2020. This decision was issued long after this litigation was instituted, and long after Plaintiffs' counsel had committed to making a request for an incentive award for these clients. In Johnson, the 11th Circuit broke with decades of practice, noting that "incentive awards . . . are fairly typical in class action cases." Johnson, 975 F.3d at 1259. However, in a split panel decision, the Johnson Court became the first court in this Circuit, and the first this writer is aware of anywhere, to hold that incentive awards of the type that have been routinely approved for decades are prohibited.

There are two things to note about the Johnson split panel decision that bear directly on its application here. First, Johnson plaintiffs have requested en banc review of that decision. Second, no mandate has issued from the 11th Circuit.

There is, of course, the very real possibility that the 11th Circuit will, on en banc review of the case, reverse an opinion that is a departure in class action practice. The Sixth Circuit recently declined to join the 11th Circuit's ruling as to incentive

awards, holding that such payments are proper and "correlated to the substantial amount of time that the named plaintiffs actually spent producing documents and otherwise advancing the litigation in the cases."  Shane Group, Inc. v. Blue Cross and Blue Shield of Michigan, 833 Fed. Appx. 430 (6th Cir. 2021).

Secondly, no mandate has been issued by the 11th Circuit.  "Until a mandate issues, an appellate judgment is not final; the decision reached in the opinion may be revised by the pane, or reconsidered by the en banc court, or certiorari may be granted by the Supreme Court."  Sabal Trail Transmission, LLC v. Lasseter, 823 Fed. Appx. 914, 918 (11th Cir. 2020), quoting Flagship Marine Svcs., Inc. v. Belcher Towing Co., 23 F.3d 341, 342 (11th Cir. 1994).

Given the no-yet-final nature of Johnson, and its departure from established practice, courts within this Circuit have separated the issue of an incentive award from otherwise approving class action settlements, post Johnson.  Just one month ago, the United States District Court for the Southern District of Florida in Fruitstone v. Spartan Race, Inc., 2021 U.S. Dist. Lexis 95860 (S.D. Fla. May 20, 2021), approved the settlement of a FDUTPA class action case, while carving out the issue of an incentive award for decision after Johnson is finally decided.  The Fruitstone case noted that no mandate in Johnson has been issued, and en banc rehearing is still pending.  As such, the Court approved all aspects of the settlement except for the

incentive award, but retained jurisdiction to allow class counsel to renew the request should Johnson be reversed.  The same Court took virtually the same approach, down to using the same language in the opinion in Janscijevic v. Classic Cruise Operator, Ltd., 2021 U.S. Dist. Lexis 95561 (S.D. Fla. May 19, 2021).

The 11th Circuit recently took the approach of severing the class incentive award issue from the fairness of the settlement writ large.  In Shiyany Huang v. Equifax, Inc., 2021 U.S. App. Lexis 16599 (June 3, 2021), the 11th Circuit considered the approval of a class action settlement of a consumer data breach case. The Court affirmed the settlement in all aspects except for the incentive award.  The Court stated, "To be clear this is the only issue on which we reverse the District Court's decision.  On remand, the District court is instructed to vacate the incentive awards and to otherwise leave the settlement agreement intact."  Huang, 2021 U.S. App. Lexis 16599.

In this case, the incentive award played no role in, and does not impact the class relief.  Class counsel simply agreed to make the request on behalf of the class representatives in conformity with the prevailing practice at the time.  Given the not-yet-finalized status of Johnson, and its outlier position on the incentive issue. Plaintiffs make the request on their behalf, without objection from Defendant. Plaintiff requests, as the Court above, have done, that this issue be carved out, with

san opportunity to present the issue to the Court for approval should <u>Johnson</u> be reversed.

### III.  <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs request an Order of this Court as follows:

1.  An Order finally approving the settlement agreements in both the Phillips (Alabama), and Marcrum (Florida) cases.

2.  A Final Order approving the two settlement classes, as defined in the Motions for Preliminary Approval.

3.  A Final Order certifying the classes, and stating that all elements of Fed.R.Civ.P. 23(a) (1)-(4), have been met; and that Rule 2(b)(3) has been met.

4.  A final Order approving the payment of $425,000.00 in attorneys' fees and expenses in both cases; $225,000.00, in the Phillips (Alabama) case, and $200,000.00, in the Marcrum (Florida) case.

5.  A Final Order retaining jurisdiction over the issue of incentive awards should <u>Johnson</u> be reversed.

<u>/s/ Brian M. Clark</u>
Brian M. Clark
*Attorney for Plaintiffs*

**OF COUNSEL:**
Wiggins Childs Pantazis Fisher & Goldfarb, LLC
The Kress Building
301 19th Street North
Birmingham, AL 35203
205-314-0500
bclark@wigginschilds.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been properly served by way of the CM/ECF system, electronic mail, and/or U.S. Mail to all counsel of record on this the 22nd day of June, 2021.

Robert H. Rutherford
BURR & FORMAN LLP
420 North 20th Street
Suite 3400, Wells Fargo Tower
Birmingham, Alabama 35203
Telephone: 205-251-3000
Facsimile: 205-458-5100

*/s/ Brian M. Clark*
Of Counsel